**LOCAL 77, AMERICAN FEDERATION OF MUSICIANS, AFL–CIO**

v.

**The PHILADELPHIA ORCHESTRA ASSOCIATION.**

**Civ. A. No. 39975.**

United States District Court
E. D. Pennsylvania.

April 5, 1966.

788

Bernard N. Katz, Philadelphia, Pa., for plaintiff.

Park B. Dilks, Jr., Philadelphia, Pa., for defendant.

JOHN W. LORD, Jr., District Judge.

Defendant is the Philadelphia Orchestra Association, hereafter called the *Association*. Plaintiff is the union representing the musicians of the Orchestra, hereafter called the *Union*. The Association has planned a concert tour of South and Central America, which hereafter will be called the *Tour*. The scheduled Tour cannot be made unless the orchestra travels by air.

On September 9, 1963, the parties entered into a collective bargaining agreement which is presently in force—hereafter called the *Contract*. This Contract contains in Article 15(B) certain provisions concerning travel requirements for out of town concerts. It has not been contended, however, that such provision or any other part of the Contract specifically mentions air travel as such.

Sometime in the summer of 1965, the Association let it be known that it was scheduling this Tour as part of the regular season encompassed by the Contract, and that the musicians—which is to say the membership of the Union—would be required to travel by aircraft.

The Union objected; there was submission to arbitration by mutual agreement, and the Arbitrator decided in a manner which the Union challenges in the present civil action.

The pleadings in this case comprise: the Complaint filed March 21, 1966; a Motion for Preliminary Injunction filed the same day; and this Court's order setting March 31, 1966 at 10 o'clock A.M. as the time for hearing on the plaintiff's motion for Preliminary Injunction and vacating of the arbitration award. Thereafter the Association filed its Motion to Dismiss under Rule 12(b) (6), Fed.R.Civ.P., on the ground that the complaint fails to state a claim against the Association upon which relief can be granted. At the same time the Association filed its Answer.

The Answer responds to the 21 numbered paragraphs of the complaint by admitting 17 thereof. As to the remainder, the Association disclaims the necessity of answer on the ground that those 4 paragraphs are simply conclusions of law. At any rate it is clearly agreed that there is no dispute as to any

matters of fact pertinent to resolution of the present litigation. The parties agree that the question should be decided purely as a matter of law.

Comprehensive briefs have been filed by both parties, and counsel have also presented their respective positions with great skill and sincerity on oral argument. Having had the benefit of these briefs and arguments, points and authorities—and having studied the pleadings and accompanying exhibits, the Court is prepared to rule upon the motions.

The complaint of Union does not attack the fact of arbitration or the form of the reference of the question. For that matter, the agreement of both parties to such arbitration is shown by the correspondence submitted with Association's Answer as Exhibits A and B thereto. One of those exhibits is a letter of Union's counsel to the American Arbitration Association dated January 28, 1966. In that letter he first disclaims acquiescence in certain characterizations of the dispute and its background which are contained in the letter (Exhibit A) of Association's counsel to the same arbitration association. But then he goes on to say:

" * * * We are in accord that the narrow issue to be determined is *whether under the collective bargaining agreement the musicians may be required to fly.*" (Exhibit B; emphasis added).

The essence of the resulting Award of Arbitrator is contained in its first paragraph (Appendix A, *infra*):

"Under the contract, the Association may require members of the Orchestra to travel by airplane on the forthcoming tour of South and Central America, except that individual members who can show a genuine physical or psychological incapacity for flying shall be excused, without pay, from making the tour."

In paragraph 16 of the Complaint, and also in paragraph 13 of the Motion for Preliminary Injunction, Union says:

"Said award and opinion is invalid and should be set aside in that:

a. The arbitrator exceeded his powers, authority and jurisdiction.

b. The arbitrator modified and amended the existing provisions of the agreement in contravention of the specific limitation imposed by Paragraph 25 of the agreement.

c. The arbitrator rendered an award and opinion which on its face is not based on the contract, but is in direct conflict with the contract and is no more than a proposed offer of settlement which had in fact been rejected by Plaintiff as is reflected in the affidavit attached hereto and marked Exhibit 'C'.

d. The arbitrator rendered an award and opinion upon subject matter which was not submitted to him."

Jurisdiction is obtained under the Labor Management Relations Act of 1947 as amended, Sec. 301, 29 U.S.C.A. § 185; and also under the Act of July 30, 1947, 61 Stat. 669, 9 U.S.C.A. § 10 relating to arbitration.

Association points out, however, that the Union's burden in seeking to set aside the award of the Arbitrator is overwhelming. The circumstances of the reference to arbitration have already been mentioned. In the collective bargaining agreement (Sec. 25) there is the Union's own commitment that the decision of the Arbitrator shall be "final and binding upon all parties." Association points to the language of the court in Local 453, I. U. of E. R. & M. Workers, etc. v. Otis Elevator Co., 314 F.2d 25, 28 (2nd Cir. 1963):

"Having bargained for the decision of the arbitrator * * * the parties are bound by it, even if it be regarded as unwise or wrong on the merits * * *."

Union counters by saying that the Arbitrator did not fulfill his obligation; that he abused the power conferred upon him. The text upon which this argument rests is a certain passage from United Steelworkers of America v. Enterprise

Wheel and Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), consisting of the last three sentences of the first full paragraph of the opinion of the Court at page 597, 80 S.Ct. at page 1361:

" * * * Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award."

Appended hereto is the award and the accompanying 12-page opinion of the Arbitrator (Appendices A & B). It must be understood that by attaching the Arbitrator's writings hereto, this Court is in no sense purporting to pass upon the merits thereof. Courts may not look into the merits of an arbitrable matter. International Tel. & Tel. Corp. v. Local 400, etc., 286 F.2d 329, 331 (3rd Cir. 1961). More cases are collected in H. K. Porter Co. v. United Saw, File and Steel Prod. Wkrs., 217 F.Supp. 161, at 164 (E.D.Pa.1963); affirmed in this respect (under same caption) 333 F.2d 596, 600 (3rd Cir. 1964).

The opinion last cited is not only a familiar one, but also is peculiarly pertinent to the present problem. Three decisions are involved in that case, with the same parties in each: the Union, being the United Saw, File and Steel Products Workers of America, Federal Labor Union No. 22254, AFL–CIO, and the Employer-company, being the H. K. Porter Company, Disston Division. After Porter acquired the Disston plant, it moved it from Philadelphia to Danville, Virginia. Agreement as to severance pay and pension rights of affected employees was held arbitrable in United Saw, File and Steel Products Workers v. H. K. Porter Co., 190 F.Supp. 407 (E.D.Pa.1960). The arbitrator's award which resulted was challenged as not within the scope of arbitration, but upheld in H. K. Porter Co. v. United Saw, File and Steel Prod. Workers, 217 F.Supp. 161 (E.D.Pa.1963).

Part I of the Ruling of the Arbitrator concerned employees whose jobs had been terminated by removal of the plant, and who had not attained the age of 65 years, but had rendered the Company more than 25 years of service. The contract simply provided that

" * * * Basic yearly allowance * * * shall be paid a retired employee who has reached the age of 65 with at least 25 years of continuous service with the company." (See 217 F.Supp. at 165).

On appeal from the District Court's affirmance of the Arbitrator's Award, the Court said in H. K. Porter Co. v. United Saw, File and Steel Products Workers, 333 F.2d 596, 601 (3rd Cir. 1964):

"In the margin is a list of the [20] instances examined by the Arbitrator where the length of service had influenced the Pension Board of Disston to grant pensions to employees notwithstanding the failure of strict compliance with the eligibility clause of sixty-five years of age and twenty-five years of continuous service. Under the circumstances of this case these practices formed a source of guidance to which the Arbitrator was authorized to look, in interpreting the eligibility clause of the agreement. The Arbitrator acted entirely within his competence in granting the pensions based on duration of service. The District Court properly approved these findings and conclusions. * * * "

In part II of the Award, the Arbitrator had also made awards to employees who had reached age 65 without 25 years of continuous service (age 65 but less than 25 years of service—as opposed to 25 years of service but age less than 65). No background or precedent of practice for awards of any kind in such case was found, and it was held that to this extent the award had been erroneously affirmed

below. That part of the award was a violation of the stricture that " * * * the Arbitrator may not administer his own brand of industrial justice." Porter Co. v. United Saw, File and Steel Products Workers, 333 F.2d 596, 602 (3rd Cir. 1964).

The factual parallel is quite close. The sale and closing of the Disston plant there was obviously not in contemplation when the saw workers and the former employer reached their bargain. In the same way, the contemplated Tour was not in mind when the Association and the Union revised and renewed their contract in 1963. The instant Contract does not mention air travel nor, for that matter, does it mention intercontinental travel, by ocean or by air.

To turn back now to the Union's position, it will be remembered its argument relies heavily upon a passage of three sentences quoted from the case of United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) which have already been quoted above. It would be well now to consider the first part of the paragraph in which those admonitions against arbitrator's private industrial justice appeared, i. e.:

"When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. *There the need is for flexibility in meeting a wide variety of situations.* The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. Nevertheless, an arbitrator is confined * * * [etc., as quoted earlier]". United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361 (1960) [emphasis added].

While the cases quoted here, and the authorities collected therein, may not contain all the law and the prophets on this subject, they suffice to show that there is but one inquiry here. It is not whether this Court approves the Arbitrator's award; or whether the award and opinion contain surplusage or on the other hand are too condensed. The question is whether the award is based on the contract. In that light the Award and Opinion, Appendices A & B hereafter, will now be re-examined.

Concentrating upon that precise question, the answer is abundantly clear: the Arbitrator did indeed carry out with fidelity his obligation to interpret and apply the contract. This is apparent as one reviews the opinion, page by page: The first page delineates the problem and its history in the first two paragraphs, and commences discussion of the contract in the third—first stating the position of the Union in that respect. On page 2 the most nearly relevant paragraph of the contract is quoted, and the Union's argument with respect thereto is briefly stated, with the Association's counter argument.

On page 3 the history of air travel with respect to orchestras generally and, since 1955, with respect to this Orchestra in particular, is discussed. The Philadelphia Orchestra has made over 30 trips by air since 1955, and the respective arguments of the Union and the Association as to whether that history establishes an acquiescence by the Union in air travel under the Contract and its predecessors is thoroughly analyzed. Circumstances of the particular trips are detailed, and the Arbitrator finds on page 4 that

" * * * Only one trip (to Havana in 1958) found all the members flying without any special agreement having been negotiated."

Down through the center of page 6 of the opinion (Appendix B), the possible significance of bargaining history and negotiation—as argued by both sides—is carefully considered. The Arbitrator concludes that the contract is not so clear and unambiguous, on the subject of air travel, as to support the Union's argument that there is no room for consider-

ation of evidence on the subject. That result is supported by reason and analysis; it is not to be deemed capricious or arbitrary.

On page 7 and 8 the custom and practice regarding air travel is considered against the background of the contract, or so much of it as is pertinent, in the following words (Appendix B, p. 8):

"In my judgment, this history indicates that the parties have recognized and accepted air travel as an acceptable and permissible mode of travel. To that extent I think there *has* been shown a mutual intent and understanding, to the effect that travel by airplane, just as much as travel by railroad, is a proper mode of transportation for out-of-town tours under the contract. It has been accepted, if you will, as meeting the contractual obligation to provide 'first class transportation'."

Beyond that, the Arbitrator does no more than to decide that

"Under the contract, the Association may require members of the Orchestra to travel by airplane on the forthcoming tour of South and Central America, except * * *."

The Union argues that the exception is gratuitous—that there are sick-leave provisions in the contract which make it unnecessary for any Arbitrator to provide the following exclusion, and machinery for its implementation (i. e.):

"* * * except that individual members who can show a genuine physical or psychological incapacity for flying shall be excused, without pay, from making the tour."

I have already determined that the Award is one which draws its essence from the contract with respect to the submitted question: whether under the collective bargaining agreement the musicians may be required to fly.

As to any other aspects of the case: it must be recalled that the matter is one of urgency—it is conceded that the disposition of the Motion for Preliminary Injunction is the essence of this case.

That is, tour departure is imminent; there is no time for full scale hearing on the merits of the complaint even were such relief available under the law. Again, prospective application of the Contract is of no concern, since counsel for the Union have stated that the Contract will be renegotiated in September of this year.

For the purposes of a Motion for Preliminary Injunction, accordingly, the requirements of a showing which would justify the extraordinary remedy of injunction must be considered. The Union alleges that there is no adequate remedy at law; and that the Union members are threatened with irreparable harm in that they will be required to sacrifice either jobs, seniority, employment rights or leave the country for six weeks with compulsory air travel.

I hold that there is no equity in the Motion of the Union as to Union's allegation that the award of the Arbitrator went beyond the submission and was not based upon the terms of the contract. I so decide because:

(1) It resolved the exact question which was submitted, and—as heretofore shown—in terms of the Contract and its interpretation; it is therefore not subject to reexamination on the merits.

(2) As to the allegation that its provisions for excusing those incapable of making the Tour go beyond the terms of the submission, I find that objection invalid for the foregoing reasons, and also for want of equity in that should any members of the Union be aggrieved thereby they would, under the very terms of that award, suffer no irreparable injury.

For all the foregoing reasons, the Motion of the plaintiff, Union, to Vacate Award of Arbitrator and for Preliminary Injunction is denied and it is so ordered.

And for the further reasons heretofore shown, the Motion to Dismiss of the defendant, the Association, is granted and the Complaint is dismissed for failure to state a claim upon which relief can be granted, and it is so ordered.

APPENDIX A

AMERICAN ARBITRATION ASSOCIATION, Administrator

Voluntary Labor Arbitration Tribunal

| | |
|---|---|
| In the Matter of the Arbitration between<br>PHILADELPHIA ORCHESTRA ASSOCIATION<br><br>— and —<br><br>AMERICAN FEDERATION OF MUSICIANS,<br>LOCAL 77<br><br>Case Number: 14 30 0071 66 | Award of Arbi-<br>trator(s) |

THE UNDERSIGNED ARBITRATOR(s) having been designated in accordance with the Arbitration Agreement entered into by the above-named Parties, and dated      September 27, 1963
and having been duly sworn and having duly heard the proofs and allegations of the Parties, AWARD, as follows:

Under the contract, the Association may require members of the Orchestra to travel by airplane on the forthcoming tour of South and Central America, except that individual members who can show a genuine physical or psychological incapacity for flying shall be excused, without pay, from making the tour.

The Association shall promptly advise each individual member of the Orchestra of this ruling. Within three days after receipt of such notice, any individual members who claim to have a genuine physical or psychological incapacity for flying, and who wish to be excused from the tour without pay for that reason, shall notify the Association of that claim and request.

Any disputes regarding management's rejection of any such requests shall be submitted promptly to arbitration, on the issue of whether the individual has shown a genuine physical or psychological incapacity for flying. The details of scheduling such arbitrations, including the selection of an arbitrator or arbitrators, shall be arranged jointly by the parties.

Lewis M. Gill

(s) ———————————————
Lewis M. Gill, Arbitrator

DATED: March 14, 1966

STATE OF              ⎫
                         ⎬ ss.:
COUNTY OF            ⎭

On this        day of        , 19    , before me personally came and appeared

to me known and known to me to be the individual(s) described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

APPENDIX B

| PHILADELPHIA ORCHESTRA ASSOCIATION<br>– and –<br>AMERICAN FEDERATION OF MUSICIANS,<br>LOCAL 77 | Arbitration<br>Case No.:<br>14 30 0071 66 |
| --- | --- |

## OPINION

This case involves an issue as to whether members of the Philadelphia Orchestra may be required to travel by airplane on a projected tour of South and Central America. The case was heard at the American Arbitration Association offices in Philadelphia on February 19, 1966, and the record was closed, upon receipt of post-hearing briefs, on March 3rd.

The projected tour, scheduled to start about May 10th and conclude about June 12th, is to cover a considerable number of countries, and it is agreed that the only possible way to meet the schedule is by flying. That is an important point to keep in mind—the question is not whether those who object to flying should be permitted to take alternate means of travel, as has been done on many domestic trips. In this case, there *is* no alternate mode of travel—the only choice is between flying or not making the trip at all. That much is agreed all around.

The issue to be decided is whether management may require the musicians to travel by airplane. The Union contends that such a requirement is improper because of a contract provision which assertedly guarantees that train accommodations will be provided for all out-of-town tours, except for certain contingencies where bus travel is

permitted. The Association contends that travel by air may properly be required under the contract.

The provision in question is Paragraph 15(B) (1) of the contract, which contains the following language:

"(1) First-class transporation, i. e., travel by railroad in coach cars for daytime travel and roomettes, bedroom and compartment cars for overnight travel, will be provided for all out-of-town concerts of the Orchestra except as follows:"

There follows a series of sub-paragraphs detailing circumstances under which bus travel may be used, basically for relatively short distances. No mention of any kind is made of travel by air, either here or anywhere else in the contract.

The Union's argument is short and simple—the contract language guarantees "first-class transportation" on all out-of-town concerts, and defines this as being travel by railroad by using the term, "*i. e.* travel by railroad". The case would be different, suggests the Union, if the contract said "*e. g.* travel by railroad", since "e. g." means "for example". But "i. e." plainly means "that is", and the language cannot legitimately be stretched so as to include air travel in the contract definition of "first-class transportation"—so argues the Union.

The Association assails this position as unrealistic and unsound even as a technical matter of contract interpretation. The language on which the Union is relying was initiated in about 1952, at which

time, it is agreed, travel by air had not developed to the point where it was re-garded as feasible for the Orchestra's tours.

■

Accordingly, the Association says, the contract language was not intended to deal at all with the question of air travel versus ground travel, but merely with defining the *kind of ground travel* which was to be considered as first-class:

As air travel became more common through the ensuing years, the Phila-'delphia Orchestra, along with other groups and organizations doing extensive travelling, resorted increasingly to air travel. Since 1955, the Orchestra has made over 30 trips by air, under this same contract language (save for certain detailed refinements as to bus travel which are not pertinent), with no objection being raised by the Union until the present case.

The management contends that this history not only shows that the parties to the contract considered air travel as coming within the scope of "first-class transportation", but also that the Union is estopped from coming forward at this late date with a claim to the contrary. As the point is summarized in the Association's brief:

"Where one party to a contract pursues a course of action which accords with the practice in the trade and upon which the other party to the contract acts in reasonable reliance, the first party may not subsequently disavow such practice at the last moment to the detriment of the other party, particularly when such disavowal is alleged to rest upon contract language which was never intended by the parties to affect, much less prohibit, such practice."

In reply to this line of argument, the Union says that the acquiescence in air travel over the years cannot properly be taken as proving anything of the sort. On all but three of the trips, alternate ground travel was available for any of the members who chose not to fly,

■

and was in fact used by some of the members. No one was *required* to fly. And on the three trips when alternate ground transportation was *not* available, special agreements were negotiated to cover two of those trips (Europe in 1955, Russia in 1958), which specifically provided for air travel. Only one trip (to Havana in 1958) found all the members flying without any special agreement having been negotiated.

All that this history shows, the Union argues, is that the members voluntarily *agreed* to fly on various occasions—it does not show that the contract allowed management to *require* them to fly.

If background events are to be considered—which the Union asserts is really improper because of the asserted clarity of the contract language—then the Union points to the 1961 negotiations as throwing the most light on the subject. In that negotiation, the Association submitted the following proposed revision of the travel clause:

"Define the phrase 'first class travel' to include travel on regularly scheduled airplane flights or on flights chartered from commercial airlines."

The management negotiators dropped this proposal, and the Union says that this negotiating history demonstrates a recognition by management that it could not require air travel under the existing language.

The Association retorts that the proposal was only dropped because the management negotiators were persuaded that

it was unnecessary. There was somewhat conflicting testimony as to what was said on the subject during the negotiations. The management witnesses testified that someone on the Union committee said there was no

■

problem in this area because the men had flown and were flying. The Union witnesses said they recalled no such statement, and one of them affirmatively denied that anything like that was said.

It is understandable that the participants would have difficulty five years later recalling exactly what was said on the subject, especially since the discussion was evidently very brief. However, I am satisfied that *something* was said on the Union side to the effect that the question of flying was not a real problem —as in fact it was not at that time. (The Orchestra had just finished one of its numerous domestic flying trips a short while before.)

Under all the circumstances, I think this episode of negotiating history does not show any concession by either side as to whether flying could or could not be required.

The same conclusion—or lack of conclusion—is apparent from the one other item of bargaining history which is available. In April 1964 a so-called "Plane and Train Settlement" was negotiated, setting forth certain procedures to apply in cases where both train and plane travel are available and some of the men elect to go by train. Whatever implications might otherwise be drawn from this agreement are effectively eliminated by paragraph 4 thereof, which states:

"This settlement is without prejudice to the parties in connection with any future arbitrations on the merits of the questions whether members of the Orchestra may or may not be compelled to fly."

About all that can be concluded from this is

■

that by April 1964, at least, the parties realized that there was an area of potential dispute as to whether flying could be required.

Up to that time—and this I think *is* a significant point—there is no evidence of any dispute or even potential dispute about flying. The Union, as indicated earlier in this discussion, brushes this history aside as merely indicating that the members chose not to make an issue of the matter; the Association insists that it is incredible that no issue would have been raised over this long period, if the Union and its members really felt that the contract had the restrictive meaning now being urged.

The significance of this history is indeed debatable, but before discussing

it further it is necessary to deal with the Union's threshold argument that the contract is so clear that no evidence regarding its intended meaning, or its proper application, should be considered at all.

Despite the vigor and eloquence with which Union counsel presses that argument, I am not prepared to accept it. It is true that "i. e." means "that is" and not "for example"—to that extent I must agree with the Union. But it does not necessarily follow that the contract language rules out air travel. There is no mention of air travel in the contract at all, and it is agreed that when this language first was negotiated, there was no problem regarding air travel. It seems clear to me that the language was written in 1952 without any mutual intent at all

concerning air travel, one way or the other.

Union's argument that the contract language is so clear that it is conclusive. The language should certainly not be treated as having a clear and unambiguous meaning on a subject on which *there was in fact no mutual intent,* clear or otherwise.

So much for the intent of the contract language when it was first written. The question then becomes one of determining what mutual intent, if any, may be inferred from the parties' actions over the ensuing years. And finally, if it should be concluded that no mutual intent is really established (a common situation in arbitration) the question then becomes one of giving the contract a sensible and fair application.

It may be worth noting at this point that the arbitrator's responsibility here is not merely limited to searching for a

Turning now to an analysis of the history in regard to the Orchestra's airplane trips since 1955, what conclusions may fairly be drawn from that history?

One important fact is that *where rail travel was available,* the members who preferred to use it were allowed to do so, even though the majority went by plane. It is also important to note that where rail transportation was *not* available, all the members flew, and no one raised the question as to whether he could be compelled to fly.

And finally, it should be kept in mind, on this last point, that there were only three occasions when ground transportation was not available, and that on two of those occasions, special agreements had been negotiated which specifically provided for air travel. That leaves only one instance—the trip to Havana in 1958—where a parallel to the present situation may be found.

situation involved—first, tours where alternate ground travel is available, and

That conclusion effectively rules out the

mutual intent. He is not to throw up his hands and declare himself without authority to decide the case if he concludes that there is not any mutual intent on the point at issue. Indeed, in most cases coming to arbitration there is *not* any mutual understanding as to how the contract is to be applied, or else the case would not be there in the first place.

This contract has the common definition of matters which are subject to arbitration, describing them as "disputes regarding the interpretation *or application* of the provisions of this Agreement" (underscoring added). The provisions must be *applied* to the dispute at hand, in a fair and sensible manner—the only restriction on the arbitrator is the usual admonition that his decision must not "have the effect of modifying or amending any provision of this Agreement".

In my judgment, this history indicates that the parties have recognized and accepted air travel as an acceptable and permissible mode of travel. To that extent I think there *has* been shown a mutual intent and understanding, to the effect that travel by airplane, just as much as travel by railroad, is a proper mode of transportation for out-of-town tours under the contract. It has been accepted, if you will, as meeting the contractual obligation to provide "first class transportation".

But that does not quite answer the issue in this case. The issue here is whether management may *require* the members of the Orchestra to fly.

Here again I think the past practice should be the guiding factor, but the practice suggests only a partial answer. There are basically two different types of

second, tours where it is not available. In the first situation, the past practice

indicates a mutual intent and understanding that the members are *not* required to fly. That points to a perfectly logical and sensible interpretation of the contract language—that the specified types of ground transportation will be provided *where they are available,* and the individual members who choose not to fly may take the ground transportation.

But the second situation, which confronts us in this case, is quite a different matter. It makes no sense at all to say that management must provide railroad transportation to Europe or to South America—there is no such transportation. And the practice, of course, has been to fly on such tours. But the practice does not throw any real light on the question of whether management may *require* the members to go on those tours.

Only the Havana trip in 1958 was a really comparable situation, and since no one refused to fly at that time, no issue was raised. I do not think that one instance, or the two other overseas tours where special agreements were made, shows any mutual intent or understanding as to whether flying may be required where ground transportation is not available.

And yet the question must be answered—as pointed out earlier, the contract must be interpreted and applied even though no mutual intent can be found. The problem is to determine what is a fair and sensible application of the contract in this situation. And in view of the importance of the time element here, there is a special responsibility in this case to provide a definite and prompt

■

answer. This last point will be developed further in a moment.

My general conclusion is that management *does* have the right to compel the members of the Orchestra to fly on this tour, except for any individual members who can show good cause for being excused from the trip. In an ordinary case, with no pressure of time limits, I would be inclined to let it go at that, leaving it to management to determine in each case whether it considered the proffered reasons as good cause, with the management decision subject to the regular grievance and arbitration procedures. But all that would take time, and there is not much time available here. Accordingly, some kind of advance ruling is appropriate, and indeed required, as to what will constitute good cause for being excused from the trip.

The problem here is to distinguish between genuine, serious objections to flying as such, and objections which are merely pretexts, covering up a disinclination to make the trip for other reasons. The management spokesmen at the hearing conceded that there are three or four so-called "hard core" objectors, who have a genuine and serious fear of flying, and stated that the Association would be willing to excuse those individuals from the trip, without pay, if they elected to stay home. But as to any others who may come forward claiming a newly-discovered aversion to flying, management indicated it would take an extremely dim view of the requests to be excused from the trip.

There is no suggestion from any side that the large majority of the members are anything but willing and

■

even eager to go on the trip. However, if any substantial number stayed home, it would seriously affect the performance of the Orchestra, and it seems clear to

me that management should not be obliged to excuse any members from the trip unless they can show a genuine physical or psychological incapacity for

flying. To allow a minority of members to stay home for any less compelling reasons, would be plainly unfair to the management and everyone else involved, including the majority of their fellow Orchestra members who naturally do not want to be embarrassed by sub-par performances.

Finally, there is a question of the mechanics of resolving any disputed individual cases promptly, in the interest of an orderly planning of the trip. The Award will provide that any members claiming to have a genuine physical or psychological incapacity for flying and desiring to be excused without pay from the trip for that reason shall notify the management of that claim within three days after the Association has notified the individual members of this ruling.

Any such individual claims which are rejected by management shall be subject to prompt arbitration on the issue of whether the member has shown a genuine physical or psychological incapacity for flying. The details of scheduling any such arbitrations including the selection of an arbitrator or arbitrators will be left to the parties.

It can be argued that in prescribing this rather detailed procedure for settling the dispute, I have in effect added something to the contract, thus exceeding my authority by "modifying or amending" the provisions of the contract. In fact, Union counsel already *has* argued that any decision allowing management to require air travel, under any circumstances, would be beyond my authority.

Needless to say, I do not share that view. The decision is, in my opinion, an application of the travel provisions of the contract based primarily on the way in which the parties themselves have applied them. It is more detailed and specific than the usual type of arbitration decision, but that has seemed necessary in order to give the kind of definite and prompt answer which was required in this highly unusual situation.

(s) Lewis M. Gill

Lewis M. Gill, Arbitrator

March 14, 1966