NATIONAL LABOR RELATIONS BOARD *v.*
STRONG, DBA STRONG ROOFING &
INSULATING CO.

No. 61. Argued December 10, 1968.—Decided January 15, 1969.

*Harris Weinstein* argued the cause for petitioner.
With him on the brief were *Solicitor General Griswold,
Arnold Ordman, Dominick L. Manoli,* and *Norton J.
Come.*

*Charles G. Bakaly, Jr.,* argued the cause for respondent.
With him on the brief was *William B. Carman.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The Roofing Contractors Association of Southern California, of which respondent was then a member, negotiated a collective bargaining contract with the Roofers Union [1] effective August 15, 1963, establishing compensation levels for the employees of member firms for the next four years. On August 20, 1963, respondent sought to withdraw from the multiple employer bargaining association which had negotiated this agreement. He then refused repeated demands from the union that he sign the contract. At length, the union filed unfair labor practice charges with the National Labor Relations Board, which found that respondent's refusal to sign the contract which had been negotiated on his behalf by the Association was a violation of §§ 8 (a)(5) and (1) of the National Labor Relations Act, 61 Stat. 140–141, as amended, 29 U. S. C. §§ 158(a)(5) and (1). The Board ordered respondent to sign the contract, cease and desist from unfair labor practices, post notices, and "[p]ay to the appropriate source any fringe benefits provided for in the above-described contract." 152 N. L. R. B. 9, 14 (1965). The Court of Appeals enforced the Board's order except as it required the payment of fringe benefits. That part of the order, the Court of Appeals said, "is an order to respondent to carry out provisions of the contract and is beyond the power of the Board." 386 F. 2d 929, 933 (1967). The Government sought and we granted certiorari as to this holding. 391 U. S. 933 (1968).

Believing the remedy provided by the Board was well within its powers, we reverse the judgment of the Court of Appeals. Section 10 (c) of the Act empowers the Board when it adjudicates an unfair labor practice to issue "an order requiring such person to cease and desist

[1] Roofers Local 36, United Slate, Tile and Composition Roofers, Damp and Waterproof Workers Association.

from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act." 61 Stat. 147, 29 U. S. C. § 160 (c). This grant of remedial power is a broad one. It does not authorize punitive measures, but "[m]aking the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board enforces." *Phelps Dodge Corp.* v. *NLRB,* 313 U. S. 177, 197 (1941). Back pay is one of the simpler and more explicitly authorized remedies utilized to attain this end.[2]

Here the unfair labor practice was the failure of the employer to sign and acknowledge the existence of a collective bargaining agreement which had been negotiated and concluded on his behalf. There is no dispute that respondent withdrew from the Roofing Contractors Association too late to escape the binding force of the agreement it had negotiated for him, supplanting previous agreements which had been negotiated in the same way.[3] Nor, in light of the obligation of an employer bargaining in good faith to sign a contract reducing agreed terms to writing, *H. J. Heinz Co.* v. *NLRB,* 311 U. S. 514, 524-526 (1941), is it argued that respondent's failure to sign the agreement was not an unfair labor practice. The judgment of the Board in these respects is not now challenged. The remedy ordered by the Board included a direction to pay the fringe benefits which would have been paid had the employer signed the agreement and thereby recognized his legal obligations which had

---

[2] See generally *Nathanson* v. *NLRB,* 344 U. S. 25, 29–30 (1952); Note, A Survey of Labor Remedies, 54 Va. L. Rev. 38, 41–95 (1968).

[3] Respondent is a past president of the Association, and thus was familiar with its bylaw that a "labor contract negotiated by the Committee shall be binding upon the Regular Members of this Association separately and collectively . . . ."

matured during the collective bargaining process. This is no more than the Act and cases like *Phelps Dodge* plainly authorize.

The challenge of the employer, in brief, is that ordering the payment of fringe benefits reserved in the contract inserts the Board into the enforcement of the collective bargaining agreement, contrary to the policy and scheme of the statute.[4] Admittedly, the Board has no plenary authority to administer and enforce collective bargaining contracts. Those agreements are normally enforced as agreed upon by the parties, usually through grievance and arbitration procedures, and ultimately by the courts. But the business of the Board, among other things, is to adjudicate and remedy unfair labor practices. Its authority to do so is not "affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise . . . ." § 10 (a), 61 Stat. 146, 29 U. S. C. § 160 (a). Hence, it has been made clear that in some circumstances the authority of the Board and the law of the contract are overlapping, concurrent regimes, neither pre-empting the other. *NLRB* v. *C & C Plywood Corp.*, 385 U. S. 421 (1967); *Carey* v. *Westinghouse Electric Corp.*, 375 U. S. 261, 268 (1964); *Smith* v. *Evening News Assn.*, 371 U. S. 195, 197–198 (1962); *Teamsters Local 174* v. *Lucas Flour Co.*, 369 U. S. 95, 101, n. 9 (1962). Arbitrators and courts are still the principal

---

[4] The fact that the payments in question here did not constitute direct pay to the employees is irrelevant in our view of this case. Whether the payments were made to the employees, who then contributed them to union trust funds in the form of higher union dues, or whether as here they passed straight from the employer to the trust funds, the final result is the same. And it is just as much in the interest of "effectuat[ing] the policies of this Act," and of making the employees whole, to require the payments in either case.

sources of contract interpretation,[5] but the Board may proscribe conduct which is an unfair labor practice even though it is also a breach of contract remediable as such by arbitration and in the courts. *Smith* v. *Evening News Assn.*, 371 U. S. 195, 197–198 (1962). It may also, if necessary to adjudicate an unfair labor practice, interpret and give effect to the terms of a collective bargaining contract. *NLRB* v. *C & C Plywood Corp.,* 385 U. S. 421 (1967).

Bearing more precisely on this case, the Board is expressly invited by the Act to determine whether an employer has refused to bargain in good faith and thereby violated § 8 (a)(5) by resisting "the execution of a written contract incorporating any agreement reached if requested by either party . . . ." § 8 (d), 61 Stat. 142, 29 U. S. C. § 158 (d); *H. J. Heinz Co.* v. *NLRB*, 311 U. S. 514, 524–526 (1941). The Board is not trespassing on forbidden territory when it inquires whether negotiations have produced a bargain which the employer has refused to sign and honor, particularly when the employer has refused to recognize the very existence of the contract providing for the arbitration on which he now insists. To this extent the collective contract is the Board's affair, and an effective remedy for refusal to sign is its proper business.

---

[5] *Steelworkers Trilogy*, 363 U. S. 564, 574, 593 (1960). Congress established the judicial remedy of § 301 of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185, in lieu of a proposal to make breach of a collective bargaining agreement itself an unfair labor practice. H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 41–42. The House Conference Report asserts that "[o]nce parties have made a collective bargaining contract the enforcement of that contract should be left to the usual processes of the law and not to the National Labor Relations Board," *id.*, at 42. See *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448, 452 (1957). Cf. LMRA § 201, 61 Stat. 152, 29 U. S. C. § 171.

Firing an employee for union membership may be a breach of contract open to arbitration, but whether it is or not, it is also an unfair labor practice which may be remedied by reinstatement with back pay under § 10 (c) even though the Board's order mandates the very compensation reserved by the contract. Cf. *NLRB* v. *Great Dane Trailers, Inc.,* 388 U. S. 26 (1967); *Mastro Plastics Corp.* v. *NLRB,* 350 U. S. 270 (1956); *Wallace Corp.* v. *NLRB,* 323 U. S. 248 (1944).

The case before us is little, if any, different. The act of refusing to sign the collective bargaining agreement may not have been a breach of contract, but it was an unfair practice. Once adjudicated, it could be remedied by a Board order requiring payment of those fringe benefits which would have been paid had the employer signed and acknowledged the contract which had been duly negotiated on his behalf. The judgment of the Court of Appeals is reversed.

*It is so ordered.*

MR. JUSTICE BLACK concurs in the reversal of the Court of Appeals' judgment, but he would direct that the cause be remanded to the Board for it to determine whether to submit the case to arbitration in accord with the contract.

MR. JUSTICE DOUGLAS, dissenting.

There is a surface logic in what the Court does today: If the Board may award back pay (which is computed from the collective bargaining agreement), it should be allowed to award fringe benefits, whose character and amount are also determined by the collective bargaining agreement. An award of back pay, however, is an express part of the legislative grant of authority,[1] while the

---

[1] Sec. 10 (c) of the Act authorizes the Board, when it finds an unfair labor practice, to issue "an order requiring such person to cease and desist from such unfair labor practice, and to take such

award of fringe benefits is not. That is, of course, not a complete answer, for Congress did not make an exhaustive catalogue of devices used to thwart the Act, but largely left to the Board "the relation of remedy to policy." See *Phelps Dodge Corp.* v. *NLRB*, 313 U. S. 177, 194.

What distinguishes the present case is the fact that fringe benefits are not products of a computer but of an arbitral process to which Congress has given strong support.[2] See *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448.

The provision for arbitration is in a sense competitive with the provision empowering the Board to remedy an unfair labor practice. It is indeed an integral part of the collective agreement providing a procedure *sui generis* for resolving grievances that arise.

There were proposals, as we noted in *Dowd Box Co.* v. *Courtney*, 368 U. S. 502, 510–511, to make a breach of a collective bargaining agreement an unfair labor practice subject to the jurisdiction of the National Labor Relations Board. But those proposals never gained the necessary support, Congress deciding that "[o]nce par-

affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act."

[2] See, *e. g.*, Aaron, "On First Looking into the Lincoln Mills Decision," in Arbitration and the Law (Proceedings, National Academy of Arbitrators) (J. McKelvey ed. 1959); Bickel & Wellington, Legislative Purpose and the Judicial Process: The Lincoln Mills Case, 71 Harv. L. Rev. 1 (1957); Bunn, Lincoln Mills and the Jurisdiction to Enforce Collective Bargaining Agreements, 43 Va. L. Rev. 1247 (1957); Cox, Reflections Upon Labor Arbitration, 72 Harv. L. Rev. 1482 (1959); Cox, The Legal Nature of Collective Bargaining Agreements, 57 Mich. L. Rev. 1 (1958); Feinsinger, Enforcement of Labor Agreements—A New Era In Collective Bargaining, 43 Va. L. Rev. 1261 (1957); Gregory, The Law of the Collective Agreement, 57 Mich. L. Rev. 635 (1959); Jenkins, The Impact of Lincoln Mills on the National Labor Relations Board, 6 U. C. L. A. L. Rev. 355 (1959).

ties have made a collective bargaining contract the enforcement of that contract should be left to the usual processes of the law and not to the National Labor Relations Board." H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 42, quoted in *Dowd Box Co.* v. *Courtney, supra,* at 511. It is that policy that is reflected in § 301 of the Labor Management Relations Act, 1947, which was before us in *Lincoln Mills,* 353 U. S., at 452. That policy was to exchange an agreement to arbitrate grievance disputes for a no-strike agreement. *Id.,* at 455.

Arbitration is not a process which the Board is either equipped or qualified to follow. Those who are arbiters have special qualifications in a particular industry and come to know the common law of the shop.[3]

The jurisdiction of any agency or branch of government has a built-in impetus for growth and expansion. Seldom does a department restrict its powers narrowly and assume a self-denying attitude. The tendency is to construe express powers broadly. The organism grows by subtle and little-noticed extensions of authority. To students of government this phenomenon is as predictable as the operation of other so-called "laws."[4]

Courts are no exception; and part of their tendency to find easy extensions of their authority was seen in their early contest with administrative agencies. See *United States* v. *Morgan,* 307 U. S. 183, 191. Recent examples

---

[3] See, *e. g.,* Christensen, Arbitration, Section 301, and the National Labor Relations Act, 37 N. Y. U. L. Rev. 411 (1962); Kovarsky, Labor Arbitration and Federal Pre-emption: The Overruling of Black v. Cutter Laboratories, 47 Minn. L. Rev. 531 (1963); Smith & Jones, The Impact of the Emerging Federal Law of Grievance Arbitration on Judges, Arbitrators, and Parties, 52 Va. L. Rev. 831 (1966); Smith & Jones, The Supreme Court and Labor Dispute Arbitration: The Emerging Federal Law, 63 Mich. L. Rev. 751 (1965); Comment, Common Law of Grievance Arbitration: New Wine in Old Bottles?, 58 Nw. U. L. Rev. 494 (1963).

[4] C. N. Parkinson, Parkinson's Law (1957).

exist in this very field of arbitration with which we are concerned here. We noted in *Steelworkers* v. *Warrior & Gulf Co.*, 363 U. S. 574, how some courts were being enticed to construe arbitration clauses as permitting or not permitting arbitration of certain kinds of disputes and then becoming entangled in the arbitral process, though it was for the arbiters, not for them. *Id.*, at 585. We relegated the courts to their narrow field, leaving arbitration to the new expertise.[5]

An arbiter is not of course free "to dispense his own brand of industrial justice" but is admonished "to reach a fair solution of a problem" within the letter and spirit of the collective bargaining agreement. *Steelworkers* v. *Enterprise Corp.*, 363 U. S. 593, 597. The past practices of the parties, as well as the contractual provisions themselves, are the guidelines.[6] *Local 77* v. *Philadelphia Orchestra*, 252 F. Supp. 787. The agreement to arbitrate is, moreover, more than a contract; it is a generalized

[5] See Aaron, Arbitration in the Federal Courts: Aftermath of the Trilogy, 9 U. C. L. A. L. Rev. 360 (1962); Davey, The Supreme Court and Arbitration: The Musings of an Arbitrator, 36 Notre Dame Law. 138 (1961); Fleming, Some Observations on Contract Grievances Before Courts and Arbitrators, 15 Stan. L. Rev. 595 (1963); Gregory, Enforcement of Collective Agreements by Arbitration, 48 Va. L. Rev. 883 (1962); Jones, The Name of the Game is Decision—Some Reflections on "Arbitrability" and "Authority" in Labor Arbitration, 46 Texas L. Rev. 865 (1968); Mayer, Labor Relations, 1961: The Steelworkers Cases Re-examined, 13 Lab. L. J. 213 (1962); Meltzer, The Supreme Court, Arbitrability and Collective Bargaining, 28 U. Chi. L. Rev. 464 (1961); Jones & Smith, Management and Labor Appraisals and Criticisms of the Arbitration Process: A Report with Comments, 62 Mich. L. Rev. 1115 (1964).

[6] See Treece, Past Practice and Its Relationship to Specific Contract Language in the Arbitration of Grievance Disputes, 40 U. Colo. L. Rev. 358, 360 *et seq.* (1968). Domke, Arbitration, 36 N. Y. U. L. Rev. 545 (1961); Fleming, Reflections on the Nature of Labor Arbitration, 61 Mich. L. Rev. 1245 (1963).

code that is understood only in light of the " 'common law of the shop which implements and furnishes the context of the agreement.' " *Steelworkers* v. *Warrior & Gulf Co., supra,* at 580. It is sometimes called "a cooperative effort by the parties and the arbitrator to develop a workable solution to the problem." [7] There is a more jaundiced view. Judge Hays, who has had considerable experience in the field, has stated:

> "A proportion of arbitration awards . . . are decided not on the basis of the evidence or of the contract or other proper considerations, but in a way which in the arbitrator's opinion makes it likely that he will be hired for other arbitration cases." P. Hays, Labor Arbitration: A Dissenting View 112 (1966). [8]

Whatever view of the process may be taken, it is clear that determining fringe benefits under a collective bargaining agreement is no job for a computer. But it can be hardly more than that when the Labor Board makes its computations for insertion in the remedial order.

What the "common law" of the shop would show covering these fringe benefits, what "past practices" might reflect on the amount of an award, what "a fair solution" of the problem might seem to be in an arbitration frame of reference, no one knows. These are matters for arbiters, chosen by the parties under the collective bargaining agreement, not for the Board, an alien to the system envisioned by *Lincoln Mills.*

---

[7] Aaron, Judicial Intervention in Labor Arbitration, 20 Stan. L. Rev. 41, 55 (1967).

[8] But see Meltzer, Ruminations About Ideology, Law, and Labor Arbitration, 34 U. Chi. L. Rev. 545 (1967).