**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.

DISTRICT 17, UNITED MINE
WORKERS OF AMERICA,
Respondent.

No. 95-1925

On Application for Enforcement of an Order
of the National Labor Relations Board.
(9-CB-7767, 9-CB-7805)

Argued: March 6, 1996

Decided: May 13, 1996

Before MURNAGHAN and NIEMEYER, Circuit Judges, and
YOUNG, Senior United States District Judge for the
District of Maryland, sitting by designation.

_____

Enforcement granted by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Michael F. Niggemyer, General Counsel, District 17,
UNITED MINE WORKERS OF AMERICA, Charleston, West Vir-
ginia, for District 17. David S. Habenstreit, NATIONAL LABOR
RELATIONS BOARD, Washington, D.C., for NLRB. **ON BRIEF:**
Frederick L. Feinstein, General Counsel, Linda Sher, Associate Gen-
eral Counsel, Aileen A. Armstrong, Deputy Associate General Coun-

sel, Linda Dreeben, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for NLRB.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

The National Labor Relations Board ("the Board") charged that District 17, United Mine Workers of America ("District 17") and Joshua Industries, Inc. ("Joshua") engaged in unfair labor practices in considering Phillip White's lay-off. The case against Joshua was severed when Joshua filed for Chapter 7 bankruptcy. The Administrative Law Judge (ALJ) found that District 17 violated 29 U.S.C. § 158(b)(1)(A) and (2) by maintaining and enforcing an agreement with Joshua under which employee seniority at Joshua's mines was to be based on the employee's length of membership in the union. The ALJ also found that District 17 violated § 158(b)(1)(A) by informing White that his seniority was to be calculated from the date he joined the union and by refusing to arbitrate his grievance because he had resisted and delayed joining the union. The ALJ's decision was affirmed by the Board which now seeks enforcement of its final order.

This Court, obligated to correct errors of law made by the Board, "must sustain the Board's factual findings `if supported by substantial evidence on the record considered as a whole.'" Virginia Concrete Co., Inc. v. N.L.R.B., 75 F.3d 974, 980 (4th Cir. 1996) (quoting 29 U.S.C. § 160(e)).

I

White was employed by Joshua at mines #4 and #32, in Logan County, West Virginia. At all times relevant to this suit, the United

2

Mine Workers of America (UMWA) was the exclusive representative of Joshua's employees covered by the National Bituminous Coal Wage Agreement ("NBCWA" or "collective bargaining agreement"). The NBCWA provided for two types of seniority: company seniority, based on the employee's date of hire, and mine seniority, based on the date when the employee began working at a particular mine.

White, hired by Joshua in April 1981 to work in #32, was supervised by Vernon Bender. Although the work performed by White was covered by the NBCWA, White did not join the UMWA and was paid on a salary basis. In February 1988, Sesco Sias and Jimmy Adkins, the president and financial secretary-treasurer of the local UMWA unit, presented Bender with a grievance which claimed that Joshua had violated the NBCWA by employing two electricians on a salary basis, when they should have been classified employees under the NBCWA. To settle that grievance, Joshua agreed to place the two electricians in the union on the condition that they be allowed to keep their dates of hire as their seniority dates. When the local indicated that White was also doing classified work on a non-classified basis, Bender agreed to require White to join the union, asking only that White, like the electricians, be permitted to maintain seniority from his date of hire. Sias and Adkins agreed to that condition.

White attended his first union meeting in April 1988, and began paying dues in June. One year later, two other non-union employees who performed classified work, Boling and Castle, were brought into the union under an agreement providing they were to retain their dates of hire as their seniority dates.

In January 1990, Joshua closed #32, and opened #4, filling positions at #4 with laid-off workers from #32. Joshua and District 17 agreed that, at #4, company seniority would control in the event of a lay-off. Laid-off at #32, White began to work at #4 mine, but by August 1990, economic factors and poor mine conditions necessitated lay-offs at #4. At that time, Sam Tiller, who replaced Bender as superintendent of #32, and Harold Robertson, #4 superintendent, announced that three miners, including White, would be laid-off and stated that Boling would keep his hire-in date as his seniority date, but White would not because White had not joined the union voluntarily. Porter agreed to this action.

3

On August 16, 1990, White was informed that his seniority would count from the time he joined the union. White then filed a grievance concerning his lay-off and, on September 7, 1990, the third step in the three-step grievance process under the NBCWA was held, at which time Tiller questioned whether White's claim was timely. The NBCWA required White to file his grievance within ten working days of learning that his seniority had been calculated improperly. Tiller noted that seniority lists had been posted at both #32 and #4 since July 1988, and that White's name had been on the bottom of these lists. Porter then determined that because White had not filed a grievance in 1988, arbitration would be futile and informed White that the union would not arbitrate his grievance. White filed his unfair labor charge on November 15, 1990.

A hearing was held before an ALJ who found that Joshua and District 17 had "followed a practice of basing the seniority of classified employees on date of membership in the Union," reasoning that "[i]f the participants to those settlements had had reason to anticipate that the NBCWA contract language concerning seniority would be applied automatically, it should not have been necessary" to negotiate those arrangements. The ALJ also considered whether White's grievance was untimely and found that White should have known of the mistake regarding his seniority in July 1988, but concluded that the timeliness of White's grievance was irrelevant. He reasoned that any effort by District 17 to pursue White's grievance would put it in conflict with its own policy which unlawfully encouraged employees to join the Union as a prerequisite to obtaining seniority.

The District appealed the ALJ's decision to the Board arguing that White's unfair labor practice complaint was barred by the NLRA's six month statute of limitations contained in § 10(b). The Board held that nothing in the seniority lists put White on notice that District 17 was involved in determining his seniority date and that Porter had stated that White began accruing seniority when he joined the union. These statements constitute violations of 29 U.S.C. § 158(b)(1)(A) that occurred within the 10(b) period.

The Board, affirming the ALJ's decision, ordered District 17 to cease and desist from its unlawful labor practices, awarded White

4

back pay and seniority from his date of hire, and now seeks enforcement of that order.

II

District 17 states several objections to the Board's order.

The ALJ concluded that an unlawful agreement existed between the union and Joshua concerning seniority and that the agreement was enforced against White. The finding concerning the existence of the agreement is supported by substantial evidence, namely the two agreements expressly stating that the seniority of formerly salaried employees would be calculated from their date of hire and testimony indicating that Porter, and therefore District 17, was aware of and approved of the unlawful agreement. In addition, substantial evidence indicates that the agreement was enforced against White. Company seniority controlled lay-offs at #4. White was originally hired by Joshua in April 1981, and joined the union in June 1988. Boling was hired in July 1985, and was brought into the union in April 1989. The only way Boling could have kept his job at #4 while White was laid-off would be to base his seniority on his date of hire and base White's seniority on his date of membership in the union. Thus, the ALJ did not err in concluding that the agreement existed or that it was enforced against White.

Furthermore, the ALJ's legal conclusion that the maintenance and enforcement of the agreement was unlawful was proper. 29 U.S.C. § 157 states:

> employees shall have the right to self-organization, to form, join, or assist labor organizations, . . . and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment.

A union that restrains employees in the exercise of the rights provided in § 157 commits an unfair labor practice.§ 158(b)(1)(A). Furthermore, a union that causes an employer to encourage union member-

5

ship "by discrimination in regard to hire or tenure of employment" also commits an unfair labor practice. §§ 158(a)(3), 158(b)(2).

The NBCWA was a valid union security contract which required White to join the UMWA to maintain his job and allowed an employer to discharge an employee who is not a union member. However, "[n]o other discrimination aimed at encouraging employees to join, retain membership or stay in good standing in a union is condoned." Radio City Officers' Union v. NLRB , 347 U.S. 17, 42 (1954). District 17 has advanced no reason why White, having become a union member, should not have his company seniority calculated from his date of hire as the NBCWA provided.[1] In fact, the agreement to base the company seniority of previously salaried employees on date of union membership discriminated against employees who failed to join the union promptly and thereby unlawfully encouraged union membership and restricted union members' right to abstain from participation in union activities. For those reasons, it violated § 158(b)(1)(A) and (b)(2).[2]

_____

[1] District 17 states "it is clear that the reason [White's] seniority did not begin to accrue prior to [1988] is that his classification (salaried employee) was not covered by the Collective Bargaining Agreement." However, that rationale was not clear to the ALJ. In fact, the ALJ concluded that the agreement to base White's company seniority on his date of union membership was contrary to the NBCWA. On questions of law, like this contract interpretation issue, "appellate review of the Board's decision is plenary, although that decision is entitled to deference due to the Board's expertise in labor matters." 88 Transit Lines, Inc. v. NLRB, 55 F.3d 823, 825 (3d Cir. 1995). This Court finds no error in the ALJ's apparent rejection of District 17's argument.

[2] **See also Teamsters Local Union No. 42 v. NLRB**, 825 F.2d 608, 614 (1987), in which, under similar circumstances, the First Circuit declared that "a union may not, without a legitimate purpose, take action favoring some of its members at the expense of others." Here, once formerly salaried employees became union members, they were entitled to be treated in the same way as all other union members. District 17's agreement to calculate their company seniority less favorably than the company seniority of other members constitutes unlawful preference without a legitimate reason.

6

By enforcing the agreement against White, the union unlawfully encouraged union membership. The record indicates that five employees performed classified work for a salary. The union accorded those employees, except White, with seniority from the date of hire because White hesitated to join the union. §§ 158(a)(3) and 158(b)(2) "allow employees to freely exercise their right to join unions, be good, bad, or indifferent members." Radio Officers' Union v. NLRB, 347 U.S. 17, 40 (1954).[3] By enforcing this agreement against White only, District 17 encouraged members not only to join the union as required by the NBCWA but to do so voluntarily. This action constitutes unlawful encouragement of union membership.

District 17 next objects to the ALJ's award of back pay to White. 29 U.S.C. § 160(c) authorizes the Board, upon finding that a party engaged in an unfair labor practice, "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter." The Board's broad remedial power authorizes it to compensate employees for losses suffered as a result of an unfair labor practice. NLRB v. Strong, 393 U.S. 357, 359 (1969).[4]

In Strong, 393 U.S. 357 (1969), the Board found an employer's failure to sign a particular collective bargaining agreement was an unfair labor practice and ordered the employer to pay the fringe benefits for which it provided. The Supreme Court enforced the Board's order, stating:

_____

[3] **See also NLRB v. Manitowoc Engineering Co.**, 909 F.2d 963, 970 (7th Cir. 1990), cert. denied, Clipper City Lodge No. 516 v. NLRB, 498 U.S. 1083 (1991) (provision of collective bargaining agreement which encouraged union members to participate in union activities unlawfully encouraged union membership in violation of #8E8E # 158(a)(3) and (b)(2)).

[4] **See also NLRB v. Rutter-Rex Mfg., Co.**, 396 U.S. 258, 263 (1969) (power to order the remedies authorized by § 160(c) "is for the Board to wield, not for the courts"); ABF Freight System, Inc. v. NLRB, 114 S. Ct. 835, 839 (1994) (courts must give NLRB's decision controlling weight unless that decision is "arbitrary, capricious, or manifestly contrary to the statute").

7

> The act of refusing to sign the collective bargaining agreement may not have been a breach of contract, but it was an unfair practice. Once adjudicated, it could be remedied by a Board order requiring payment of those fringe benefits which would have been paid had the employer signed and acknowledged the contract which had been duly negotiated on his behalf.

Id. at 362. Here, the ALJ found that District 17 committed an unfair labor practice when it entered into the unlawful agreement. If District 17 had not done so, White's seniority would not have been calculated from the date of union membership, and he would not have been laid off. The Board's award of back pay to White merely compensates White for his loss. The fact that the terms of the collective bargaining agreement may not have required Joshua to correct its calculation of White's seniority is not dispositive. Instead, the Board has broad power to remedy a practice which it has found is unfair.

District 17 next objects that it was not required to arbitrate White's grievance because the district had concluded that it lacked merit. While a union has no duty to arbitrate a meritless grievance, a union may not refuse to arbitrate a grievance for a discriminatory reason. A union breaches its statutory duty of fair representation, and commits an unfair labor practice, when its conduct toward a member of the collective bargaining unit is "arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171, 186, 190 (1967). The ALJ found that, even before Joshua raised the issue of the timeliness of White's grievance, District 17, through Porter, reaffirmed the union's unlawful agreement regarding seniority by asserting that White's seniority should be calculated from the date of his entry into the union. Such action on the part of District 17 was discriminatory and was therefore an unfair labor practice.

District 17's remaining objections require little discussion. The district objects that the ALJ mistakenly recognized a classification of "contract-classified work" under the NBCWA. The ALJ did in fact refer to "contract-classified work", but apparently used that term as a short-hand way to refer to classified work performed by salaried employees.

8

District 17 also argues to this Court, as it earlier argued to the Board, that White's unfair labor practice charge is time-barred. For the reasons noted by the Board and the ALJ, this Court finds that White's charge is not time-barred.

District 17 next argues that the ALJ incorrectly found that, in all events relevant to this litigation, the local unit acted as an agent of District 17. We need not decide this issue because the ALJ used agency principles to support his findings concerning the oral agreement only and then only as an alternative basis of liability. As discussed above, the record contains substantial evidence, independent of the agency theory, indicating that Porter approved of the unlawful agreement and its enforcement against White.

Finally, District 17 states that the ALJ "cites the district for animus based upon . . . various complaints by local union officials against Harold Porter." District 17 is apparently referring to certain letters written by Allen Adkins in March 1992 expressing dissatisfaction with Porter. Far from basing any finding of discrimination on those letters, the ALJ expressly stated, "There is no evidentiary basis or need to resolve questions raised by these letters in order to reach a determination herein."

We find that the Board's decision is consistent with the law and is supported by substantial evidence in the record. For that reason, the Board's order is

ENFORCED.

9