GALLOWAY TOWNSHIP BOARD OF EDUCATION, RESPON-
DENT-RESPONDENT, v. GALLOWAY TOWNSHIP AS-
SOCIATION OF EDUCATIONAL SECRETARIES, CHARG-
ING PARTY-APPELLANT.

Argued March 7, 1978—Decided August 1, 1978.

(1)

*Mr. James M. Blaney* argued the cause for appellant (*Messrs. Starkey, White and Kelly,* attorneys).

*Mr. Sidney H. Lehmann,* General Counsel, argued the cause for appellant Public Employment Relations Commission (*Mr. Lehmann,* attorney; *Mr. Don Horowitz,* Deputy General Counsel, on the brief).

*Mr. James P. Granello* argued the cause for respondent (*Messrs. Murray, Meagher and Granello,* attorneys; *Mr. Robert J. Hrebek,* on the brief).

*Messrs. Ruhlman and Butrym* submitted a brief on behalf of *amicus curiae* New Jersey Education Association (*Mr. Cassel B. Ruhlman,* on the brief).

*Messrs. Pellettieri and Rabstein* submitted a brief on behalf of *amicus curiae* New Jersey State AFL-CIO (*Mr. Ira C. Miller,* on the brief).

The opinion of the court was delivered by

PASHMAN, J. Two significant issues of public employment labor relations are presented by this appeal. The first concerns the propriety of an award of back pay by the Public Employment Relations Commission (PERC) as a remedy in an unfair practice proceeding under the New Jersey Employer-Employee Relations Act (the Act), *L.* 1968, *c.* 303, as amended by *L.* 1974, *c.* 123, *N. J. S. A.* 34:13A–1 *et seq.* The second concerns the effect of an allegation of mootness on the enforceability of PERC orders in unfair practice cases.

By reason of its victory in a representation election conducted by PERC, the Galloway Township Association of Educational Secretaries (the Association) was certified as the exclusive majority representative of all secretarial and clerical employees employed by the Galloway Township Board of Education (the Board) for the purpose of collective negotiations pursuant to the Act. *See N. J. S. A.* 34:13A–5.3; *N. J. A. C.* 19:10–1.1(a) (4). The entire negotiating unit represented by the Association consisted of seven secretaries.

Prior to and during the course of negotiations between the Association and the Board directed at reaching the initial collective agreement to govern the terms and conditions of employment for the unit employees, the Board announced certain alterations in the work schedules of six of the seven secretaries in the unit. The work day of four of the secretaries was reduced from seven hours per day to four and the reporting and departure times for two other secretaries were changed. None of these changes in the secretaries' working conditions was the subject of the negotiation between the Board and the Association. The announced alterations were unilaterally implemented by the Board at the start of a new school year in September 1975. No collective agreement had been achieved by the parties as of that date and no such agreement has ever been reached.

The Association had filed an unfair practice charge on August 29, 1975 against the Board with PERC. It alleged that the unilateral alteration of the secretaries' working hours constituted unlawful interference with the employees' exercise of their statutory rights and an unlawful refusal to negotiate in good faith. PERC subsequently issued an unfair practice complaint and notice of hearing, to which the Board filed an answer. *See N. J. A. C.* 19:14–2.1, 3.1. The Board and the Association stipulated to "all the essential facts" and waived an evidentiary hearing; the matter was accordingly submitted to PERC for decision on the basis of the stipulated record and briefs submitted by the parties. *See N. J. A. C.* 19:14–6.7.

In a determination not challenged before us, PERC ruled that the Board's announcement and implementation of changes in the secretaries' working hours constituted unfair practices in violation of both *N. J. S. A.* 34:13A–5.4(a) (1) and (5).[1] PERC No. 76–31, 2 *NJPER* 182 (1976). The

------

[1] *N. J. S. A.* 34:13A–5.4(a) prohibits public employers from:
(1) Interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed to them by the Act.

Board's unilateral action was found to have breached its statutory duty to negotiate the subject of modifications in working conditions with the majority representative before any alterations are made. *N. J. S. A.* 34:13A–5.3. By way of relief, PERC ordered the Board to cease and desist from:

(a) Interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed to them by the Act;
(b) Refusing to negotiate collectively in good faith with the Association as the majority representative of secretarial employees concerning the terms and conditions of employment of those employees;
(c) Unilaterally altering, or threatening to unilaterally alter, terms and conditions of employment of its secretarial employees during the course of collective negotiations with the Association.

PERC also directed the Board to take the following affirmative action, which PERC found necessary to effectuate the policies of the Act:

(a) Upon request, negotiate collectively in good faith with the Association concerning the terms and conditions of employment of its secretarial employees;
(b) During the course of collective negotiations with the Association, restore the hours of employment of its secretarial employees as they existed prior to the Board's unilateral implementation of the change in working hours;
(c) Pay its secretarial employees whose hours of employment were unilaterally reduced the monetary difference between the amounts they would have received had their hours not been unilaterally reduced and the amounts they were in fact paid since that reduction took effect;
(d) Post notices supplied by PERC advising its employees of its willingness to abide by PERC's determination and to comply with the Act;
(e) Advise PERC of the steps taken to comply with the order.

The Board filed a notice of appeal from PERC's decision and order to the Appellate Division. PERC thereupon filed a cross-application for enforcement of its order pursuant to

---

\* \* \* \* \* \* \* \*
(5) Refusing to negotiate in good faith with a majority representative of employees in an appropriate unit concerning terms and conditions of employment of employees in that unit \* \* \* .

*N. J. S. A.* 34:13A–5.4(f). The Appellate Division affirmed PERC's decision and its order that the secretaries' unlawfully changed working hours be restored. The court indicated that PERC's cease and desist orders and its order to negotiate were moot and vacated its award of back pay as *ultra vires* its remedial powers under *N. J. S. A.* 34:13A–5.4(c). 149 *N. J. Super.* 346 (App. Div. 1977). Both the Association and PERC filed unsuccessful petitions for rehearing with the Appellate Division. Their petitions for certification were granted by this Court. 75 *N. J.* 29 (1977). We permitted the New Jersey Education Association and the New Jersey State AFL-CIO to file briefs as *amici curiae*.

██ ██ As noted, the Board did not seek review of the Appellate Division's affirmance of PERC's determination that it had committed unfair practices in violation of the Act and of PERC's order that the secretaries' working hours be restored. Consequently, the validity of those rulings is not contested before this Court. We nevertheless note our agreement with the resolution of the issues below. *See Galloway Tp. Bd. of Education v. Galloway Tp. Education Assn.,* 78 *N. J.* 25 (1978). Our only concern herein is with the propriety of the portions of PERC's order invalidated by the Appellate Division.

## I

### *The Propriety of PERC's Award of Back Pay*

██ Upon an adjudication that a party has committed an unfair practice in violation of *N. J. S. A.* 34:13A–5.4(a) or (b), PERC is empowered to issue

* * * an order requiring such party to cease and desist from such unfair practice and to take such reasonable affirmative action as will effectuate the policies of this act. * * *

[*N. J. S. A.* 34:13A–5.4(c)][2]

---

[2]*L.* 1974, c, 123, § 1 granted PERC exclusive jurisdiction over unfair practices, *see N. J. S. A.* 34:13A–5.4(c), as therein defined.

We have concluded that the power to order that an employee be made whole through an award of back pay is necessarily subsumed within the broad remedial authority the Legislature has entrusted to PERC.

In *Lullo v. Intern. Assn. of Fire Fighters*, 55 *N. J.* 409 (1970), we observed that the original Act's provision for exclusive representation in collective negotiations, *N. J. S. A.* 34:13A–5.3, was modeled upon its private sector counterpart, § 9(a) of the federal Labor Management Relations Act (LMRA), 29 *U. S. C.* § 159(a). We accordingly held that the "experience and adjudications" under the federal act may appropriately guide the interpretation of the provisions of the New Jersey statutory scheme. Although *Lullo* was concerned with the Act prior to its amendment in 1974, its admonition to look to the Act's federal analogue is particularly appropriate with respect to the interpretation of the unfair practice provisions of *N. J. S. A.* 34:13A–5.4, as these parallel the unfair labor practice provisions of the LMRA in many respects. *Compare N. J. S. A.* 34:13A–5.4(a), (b), (c), and (f) with 29 *U. S. C.* §§ 158 and 160.

The provision of the federal act corresponding to the above-quoted portion of *N. J. S. A.* 34:13A–5.4(c) authorizes the National Labor Relations Board (NLRB) to order a party adjudged to have committed an unfair labor practice to

* * * cease and desist from such unfair labor practice, and to take such affirmative action *including reinstatement of employees with or without back pay*, as will effectuate the policies of this [Act]. * * *
[29 *U. S. C.* § 160(c) (emphasis added)]

The Appellate Division viewed the resolution of the issue of PERC's authority with respect to awarding back pay to

See *Patrolmen's Benev. Assn. v. Montclair*, 70 *N. J.* 130, 136 (1976). This grant was made in response to this Court's holding in *Burlington Cty. Evergreen Park Mental Hosp. v. Cooper*, 56 *N. J.* 579 (1970), that PERC lacked such jurisdiction under the original Act, *L.* 1968, *c.* 303.

turn on the significance to be attributed to the omission of the words "including reinstatement of employees with or without back pay" from *N. J. S. A.* 34:13A–5.4(c) in view of their presence in the counterpart provision of the federal statute. The court held that the omission of such a specific authorization for an award of back pay precluded the implication of such power and was fatal to PERC's position. We believe that the court erred in taking such a narrow approach in interpreting the scope of PERC's authority pursuant to *N. J. S. A.* 34:13A–5.4(c).

■ Indeed, under the Appellate Division's analysis, PERC would be powerless to order the reinstatement of an employee discharged in violation of the Act, a result repugnant to the Act's attempt to protect public employees in the exercise of the organizational rights secured them in *N. J. S. A.* 34: 13A–5.3. In our view, the legislative mandate that an unfair practice respondent be ordered to take the reasonable affirmative action PERC deems necessary to the effectuation of the Act's policies supplies ample authority for a remedial award of back pay to compensate an employee for wages lost by reason of the commission of an unfair practice.

■ Although the Appellate Division correctly looked to the analogous federal statute in attempting to ascertain the intended meaning of relevant language of *N. J. S. A.* 34: 13A–5.4(c), it failed to look far enough. The judicial interpretations of § 10(c) of the LMRA have firmly established that the specific language therein omitted from the New Jersey statute is merely illustrative of the remedial authority of the NLRB derived from the more general statutory language. A brief review of the treatment of back pay awards in the federal labor law context demonstrates that the absence of comparable language in *N. J. S. A.* 34:13A– 5.4(c) does not diminish PERC's remedial powers.

The United States Supreme Court has described the purpose of an award of back pay by the NLRB:

A back pay order is a reparation order designed to vindicate the public policy of the [LMRA] by making the employees whole for losses suffered on account of an unfair labor practice.

[*Nathanson v. NLRB*, 344 *U. S.* 25, 27, 73 *S. Ct.* 80, 82, 97 *L. Ed.* 23 (1952)]

Determining the appropriateness of ordering back pay in a particular case is a matter entrusted to the expert discretion of the NLRB, as such a remedy is not mandatory under § 10(c). *Phelps Dodge Corp. v. NLRB,* 313 *U. S.* 177, 198, 61 *S. Ct.* 845, 85 *L. Ed.* 1271 (1941). Where the NLRB, in the exercise of its broad discretion under § 10(c) in fashioning a remedy for an unfair labor practice, has awarded back pay, judicial review of its action is very limited. Its order must stand unless it is demonstrated that the award is a "* * * patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the [LMRA]." *NLRB v. Seven-Up Bottling Co.,* 344 *U. S.* 344, 346–347, 73 *S. Ct.* 287, 289, 97 *L. Ed.* 377 (1953), quoting *Virginia Electric & Power Co. v. NLRB,* 319 *U. S.* 533, 540, 63 *S. Ct.* 1214, 87 *L. Ed.* 1568 (1943); *see also Fibreboard Corp. v. NLRB,* 379 *U. S.* 203, 216, 85 *S. Ct.* 398, 13 *L. Ed.* 2d 233 (1964).

The Supreme Court has recognized that making employees whole for their actual economic losses attributable to the commission of an unfair labor practice "* * * is part of the vindication of the public policy which the [NLRB] enforces." *Phelps Dodge Corp. v. NLRB, supra,* 313 *U. S.* at 197, 61 *S. Ct.* at 854. The Court has stressed that the primary purpose of a back pay order is to make the aggrieved employees whole:

* * * the [NLRB] could properly conclude that back pay is * * * a remedy designed to restore, so far as possible, the *status quo* that would have obtained but for the wrongful act.

[*NLRB v. J. H. Rutter-Rex Mfg. Co.,* 396 *U. S.* 258, 265, 90 *S. Ct.* 417, 421, 24 *L. Ed.* 2d 405 (1969) (citation omitted)]

·

The award of back pay has been sanctioned as a remedy for an employer's unlawful refusal to bargain in good faith in contravention of § 8(a) (5) of the LMRA, 29 *U. S. C.* § 158(a) (5). *NLRB v. Strong,* 393 *U. S.* 357, 89 *S. Ct.* 541, 21 *L. Ed.* 2d 546 (1969).

Two federal cases have discussed the significance of the inclusion of a specific authorization for the NLRB to order reinstatement and back pay as a remedy for an unfair labor practice in the federal statute. In *NLRB v. Waumbec Mills,* 114 *F.* 2d 220 (1 Cir. 1940), a federal appeals court observed that the relevant phrase

* * * was more probably inserted out of abundant caution to illustrate a type of relief appropriate to the commonly recurring unfair labor practice of discriminatory discharge rather than put in for the purpose of limiting the remedial powers of the [NLRB]. * * *
[114 *F.* 2d at 235]

The court interpreted the decision of the Supreme Court in *NLRB v. Fansteel Metal Corp.,* 306 *U. S.* 240, 59 *S. Ct.* 490, 83 *L. Ed.* 627 (1939), as indicating that "* * * the only restriction upon the [NLRB's] power to prescribe affirmative relief is the general one that the order must effectuate the policies of the Act." *Id.* In *Fansteel,* the Court had described the underlying rationale of the NLRB's affirmative action mandate:

* * * [T]he power to command affirmative action is remedial, not punitive, and is to be exercised in aid of the [NLRB's] authority to restrain violations and as a means of removing or avoiding the consequences of violation where those consequences are of a kind to thwart the purposes of the Act.
* * * * * * * *
[T]he purpose of the Act is to promote peaceful settlements of disputes by providing legal remedies for the invasion of the employees' rights. * * * The affirmative action that is authorized is to make these remedies effective in the redress of the employees' rights. * * *
[306 *U. S.* at 257–258, 59 *S. Ct.* at 497]

The Supreme Court approved the analysis of the *Waumbec Mills* decision in *Phelps Dodge Corp. v. NLRB, supra. See*

313 *U. S.* at 186 n. 5, 61 *S. Ct.* 845. Justice Frankfurter there held that the specific statutory language was unnecessary for the NLRB to possess the power to order reinstatement with back pay, since that power was encompassed within its general authority to mandate affirmative action to "effectuate the policies" of the federal law:

It could not be seriously denied that to require discrimination in hiring or firing to be "neutralized" * * * by requiring the discrimination to cease not abstractly but in concrete victimizing instances, is an "affirmative action" which "will effectuate the policies of this Act." Therefore, if § 10(c), had empowered the Board to "take such affirmative action as will effectuate the policies of this Act", the right to restore to a man employment which was wrongfully denied him could hardly be doubted. * * * Attainment of a great national policy through expert administration in collaboration with limited judicial review must not be confined within narrow canons for equitable relief deemed suitable by chancellors in ordinary private controversies. * * * To differentiate between discrimination in denying employment and in terminating it, would be a differentiation not only without substance but in defiance of that against which the prohibition of discrimination is directed.

But, we are told, this is precisely the differentiation Congress has made. It has done so, the argument runs, by not directing the Board "to take such affirmative action as will effectuate the policies of this Act," *simpliciter*, but, instead, by empowering the Board "to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act." *To attribute such a function to the participial phrase introduced by "including" is to shrivel a versatile principle to an illustrative application. We find no justification whatever for attributing to Congress such a casuistic withdrawal of the authority which, but for the illustration, it clearly has given the Board. The word "including" does not lend itself to such destructive significance* * * *.

> [313 *U. S.* at 188–189, 61 *S. Ct.* at 849–850 (footnotes and citations omitted) (emphasis added)]

The Court thus held that the NLRB was authorized to order the hiring of a person who had unlawfully been denied employment, even though such an action did not constitute "reinstatement," stating that the NLRB's

* * * power to order an opportunity for employment does not derive from the phrase "including reinstatement of employees with or without back pay," and is not limited by it.

[313 *U. S.* at 191, 61 *S. Ct.* at 851]

In view of the definitive declarations of these decisions that the relevant phraseology in the model federal legislation is primarily illustrative and clarifying, the Appellate Division erred in according dispositive significance to the omission of this language from the New Jersey statute. Its conclusion that the omission evinced a legislative intent to restrict the remedial authority accorded PERC by *N. J. S. A.* 34:13A-5.4(c) is not sustainable under the rationale of the federal labor law precedents. Moreover, wholly apart from the federal analogy, the lower court's analysis failed to consider our own treatment of a similar issue of statutory construction in *Jackson v. Concord Co.*, 54 *N. J.* 113 (1969).

The controversy in *Jackson* centered on the power of the Division on Civil Rights under the Law Against Discrimination, *N. J. S. A.* 10:5-1 *et seq.*, to order that a person found to have committed an unlawful discriminatory practice pay compensatory damages to an aggrieved complainant. The applicable statute provided, in pertinent part, that the Division, upon adjudicating a violation, shall order the respondent party to cease its unlawful conduct and further order it to

* * * take such affirmative action, including but not limited to, hiring reinstatement or upgrading of employees, with or without back pay, or restoration to membership in any respondent labor organization, or extending full and equal accommodations, advantages, facilities and privileges to all persons, as, in the judgment of the director, will effectuate the purposes of this Act * * *.

[*N. J. S. A.* 10:5-17]

In response to the contention that such a remedy exceeded the Division's statutory authority, we held that the omission of an express grant of such power was not fatal, because its "* * * implication is plain enough considering the

broad language of [*N. J. S. A.* 10:5–17] in the light of the overall design of the act." *Jackson v. Concord Co., supra,* 54 *N. J.* at 126. We found unimpressive the argument that the statute's failure specifically to empower the administrative agency to order the challenged remedy indicated "a legislative intention to exclude in the absence thereof." 54 *N. J.* at 127. We referred to our rejection of a similar argument in *Levitt and Sons, Inc. v. Div. Against Discrimination,* 31 *N. J.* 514 (1960), where we had held that the absence of specific phraseology in a statute may, in certain instances, be attributable to a legislative determination that more general language is sufficient to include a particular matter within the purview of the statute without the necessity of further elaboration. *See* 31 *N. J.* at 527–528. We held that the specific types of remedial action enumerated in the statute were illustrative and not restrictive of its general grant of remedial authority. *Id.* at 528.

In order to eliminate any possible claim that illustrative examples of permissible remedies excluded any remedies not so specified, the Legislature apparently decided to rely solely on *N. J. S. A.* 34:13A–5.4(c)'s general mandate that PERC could order "such reasonable affirmative action as will effectuate the policies" of the Act in order to provide the administrative agency with the desired remedial flexibility. In light of both the federal experience and our adjudications involving the Law Against Discrimination, we may fairly assume that the Legislature took the cautious route in formulating *N. J. S. A.* 34:13A–5.4(c), confident that its broad grant of authority therein would be sufficient to sanction all PERC remedial orders which meet the statutory test of reasonable effectuation of the Act's purposes. *See N. J. S. A.* 34:13A–5.4(f).

In resolving the *ultra vires* issue, we are mindful that the Employer-Employee Relations Act is a remedial enactment which should be construed in order to permit PERC effectively to discharge its statutory responsibilities. *Cf. New Jersey Guild of Hearing Aid Dispensers v. Long,*

75 *N. J.* 544, 562 (1978). Denying PERC the ability to award back pay where that remedy is necessary to cure the effects of an unfair practice would substantially thwart the legislative goal of promoting peaceful public employment labor relations. *See N. J. S. A.* 34:13A–2. As the above-cited federal cases demonstrate, back pay awards play a critical role in the safeguarding of employee rights. Public employees victimized by unfair practices committed by employers or employee organizations could not truly be made whole if PERC's remedial powers lacked the "teeth" provided by the authority to award back pay, whose deterrent effect is considerably more forceful than that embodied in a cease and desist order. Elimination of the prospect of monetary sanction for employers or employee organizations which engage in unlawful conduct would deprive PERC of an effective tool in vindicating the public employees' rights secured by the Act and thereby tend to nullify the deterrent aspect of its remedial authority.

We accordingly hold that under *N. J. S. A.* 34:13A–5.4(c) PERC possesses the authority to order that a party found to have violated the Act make the affected employees whole for their actual losses sustained by reason of the commission of an unfair practice in violation of *N. J. S. A.* 34:13A–5.4(a) or (b) through the payment of back pay. It is an authority, however, which should be exercised with due regard for the employer's status as a governmental entity serving the public and funded by the taxpayers.

## II

### *Mootness and Enforceability*

The basis of the Appellate Division's vacating the portions of PERC's order requiring the Board to cease and desist its unlawful conduct and to negotiate in good faith with the Association upon request was the court's finding of a dissolution of the Association as an entity. The court concluded that this turn of events mooted the issue of the

enforceability of the obligations imposed on the Board by these provisions of PERC's order. In reaching this conclusion, the court apparently accepted the Board's contention that compliance with PERC's order to negotiate was impossible. This contention was based on the Board's claim that because of the dissolution of the Association, there was no one with whom it could negotiate.

The factual predicate of the alleged dissolution was the separation from employment with the Board of six of the seven secretaries comprising the negotiating unit of which the Association was the majority representative. The court was advised of this development by counsel for the Association and considered it to be tantamount to a dissolution of the Association. The resignations of these secretaries, who had apparently formed and been the original members of the Association, had not been mentioned in the parties' stipulation of facts upon which PERC's decision and order were based. Hence, the issue of mootness was not before PERC and was not passed upon.

The Association remains as the official PERC-certified majority representative of the negotiating unit of secretaries employed by the Board. It appears from the scant record before us that the positions held by the departed secretaries have been filled by new employees. Thus, the job titles which were included in the negotiating unit represented by the Association continue to exist, although different employees hold the jobs at present. No representation proceeding aimed at the replacement or ouster of the Association as the majority representative, *see N. J. A. C.* 19:11–1.1(a) (1) and (3), has been initiated by the present unit employees, although the Association's certification year has long since expired.[3] Nevertheless, the Appellate

---

[3]Pursuant to *N. J. S. A.* 34:13A–5.4(e), PERC has promulgated regulations governing representation proceedings as defined in *N. J. A. C.* 19:10–1.1(a)(23). *See N. J. A. C.* 19:11–1.1 *et seq.* Normally, under *N. J. A. C.* 19:11–2.8(b), for one year after the certification

Division viewed the continued vitality of the Association as an entity to be contingent upon the continued employment of the persons who organized it and comprised its membership. It apparently attributed no significance to the continued existence of the job titles encompassed in the negotiating unit, irrespective of the identity and employee organization membership *vel non* of the persons who hold those jobs.[4]

With respect to the issue of the enforceability of PERC's order that the Board negotiate with the Association upon request, the federal experience concerning the equivalent NLRB remedial order, a bargaining order, is instructive. The federal cases hold generally that a change in the representational desires of the employees in the unit represented by a union victimized by an employer's unfair labor practices is irrelevant to the enforceability of an NLRB order requiring the employer to bargain with the union shown to have had majority support at the time of employer's unlawful conduct. The union's loss of majority status need not be attributable to the particular unfair labor practices committed by the employer. The rationale for the federal rule is the belief that a union which has been freely chosen by

---

of a majority representative its majority status is conclusively presumed so as to bar the filing of any petition seeking certification of another majority representative or merely decertification of their present one.

[4]The record does not reveal the present employment status of the seventh secretary included in the unit or whether she was ever a member of the Association. Under the Act, a majority representative organization must represent the interests of all unit employees without regard to employee organization membership. *N. J. S. A.* 34:13A–5.3. Public employees cannot be compelled, as a condition of employment, to become members of the organization which acts as the majority representative of the negotiating unit which includes their particular positions, as the so-called "agency-shop" arrangement is not authorized by the Act. *See Turnpike Employees Union v. N. J. Turnpike Authority*, 117 *N. J. Super.* 349 (Ch. Div. 1971), aff'd 123 *N. J. Super.* 461 (App. Div. 1973), aff'd 64 *N. J.* 579 (1974).

the unit employees as their bargaining representative must be permitted to enjoy that right. The decisions have emphasized that no injustice is done to the employees who no longer support the union by enforcement of a bargaining order, since they remain free to resort to the representation proceedings available under the LMRA to express their desire to discontinue their representation by that union. *See NLRB v. Gissel Packing Co. Inc.,* 395 *U. S.* 575, 610–613, 89 *S. Ct.* 1918, 23 *L. Ed.* 2d 547 (1969); *NLRB v. Katz,* 369 *U. S.* 736, 748 n. 16, 82 *S. Ct.* 1107, 8 *L. Ed.* 2d 230 (1962) (unlawful unilateral alteration of working condition during the course of collective bargaining); *Franks Bros. Co. v. NLRB,* 321 *U. S.* 702, 704–06, 64 *S. Ct.* 817, 88 *L. Ed.* 1020 (1944); *Medo Photo Supply Corp. v. NLRB,* 321 *U. S.* 678, 687, 64 *S. Ct.* 830, 88 *L. Ed.* 1007 (1944); *NLRB v. Lorillard Co.,* 314 *U. S.* 512, 513, 62 *S. Ct.* 397, 86 *L. Ed.* 380 (1942); *NLRB v. A. W. Thompson, Inc.,* 449 *F.* 2d 1333, 1337 (5 Cir. 1971); *General Electric Co. v. NLRB,* 400 *F.* 2d 713, 730 and n. 17 (5 Cir. 1968); *Sakrete of No. Calif., Inc. v. NLRB,* 332 *F.* 2d 902, 909–10 (9 Cir. 1964), *cert.* den. 379 *U. S.* 961, 85 *S. Ct.* 649, 13 *L. Ed.* 2d 556 (1965).

Other cases have emphasized that the appropriateness of a bargaining order remedy must be assessed as of the time the case arose before the NLRB; subsequent events affecting the majority status of the union are immaterial in determining whether the bargaining order shall be enforced. *NLRB v. Pacific Southwest Airlines,* 550 *F.* 2d 1148, 1153 (9 Cir. 1977); *NLRB v. L. B. Foster Co.,* 418 *F.* 2d 1, 5 (9 Cir. 1969). Consistent with this view, NLRB bargaining orders have been enforced despite a substantial turnover among employees or other factors affecting the union's majority status. *See GPD, Inc. v. NLRB,* 430 *F.* 2d 963, 964 (6 Cir. 1970); *NLRB v. L. B. Foster Co., supra,* 418 *F.* 2d at 45; *NLRB v. Luisi Truck Lines,* 348 *F.* 2d 842, 847–48 (9 Cir. 1967) · *Sakrete of No. Calif., Inc. v. NLRB, supra,* 332 *F.* 2d at 909; *NLRB v. Andrew Jergens Co.,* 175 *F.* 2d 130, 134–35 (9 Cir. 1949). These decisions have recognized

that a central purpose of the remedial powers given to the NLRB is to enable it to cure the effects of unfair labor practices by reestablishing as nearly as possible the *status quo* prevailing before the violations took place. *See, e.g., GPD, Inc. v. NLRB, supra.*

The fact that six of the seven original employees in the unit represented by the Association are no longer employed by the Board is not conclusive of the dissolution of the employee organization. The Association continues as the official majority representative of the employees who presently hold the positions contained within the negotiating unit until it is decertified or a new representative is chosen by the employees. The representational interests of the present unit employees are as deserving of legal protection as would be those of the original employees had their employment continued. It is irrelevant to the enforcement question that none of the present employees had been involved in the formation of the Association or has ever overtly declared his support for or membership in that organization. Decision on the enforcement question must be guided by the fact that the representational desires of the present unit employees are unknown. We cannot infer from their silence in this respect that they wish to disavow the Association as their majority representative. It is equally inferable that a fear of harmful consequences to their employment status has deterred them from exercising their statutory right to engage in collective activity.

Restoration of the *status quo* which prevailed prior to the Board's unlawful conduct requires that the present employees have the same rights *vis a vis* their public employer as were possessed by their predecessors prior to the Board's commission of the unfair practices. The critical right for present purposes is the right to have their employer be under an enforceable legal obligation to negotiate in good faith with their majority representative. Because of their employer's demonstrated unwillingness to abide by its obligations imposed by statute, the additional incentive

of a judicial decree of enforcement is necessary to safeguard the employees' opportunity to avail themselves of that right should they so desire.

In this regard it is important to note that PERC's order requires the Board to negotiate with the Association only if a request for such negotiation is made. Since the Association can be the majority representative only of the secretaries presently employed by the Board, the requisite request for negotiation would necessarily have to be initiated by the present employees. If the present secretaries do not wish to have the Association act on their behalf for purposes of collective negotiations, no such request will be made. If a request for negotiations is made but there is a division in the representational desires of the employees, those who do not wish to have the Association act as their majority representative are free to institute the appropriate representation proceeding under PERC's auspices to challenge the Association's continued majority status. *See N. J. A. C.* 19 :11–1.1 *et seq.*

On the record before us, it is impossible to determine the representational desires of the present secretaries and hence impossible to say what the ultimate fate of the Association as their majority representative will be. Enforcement of PERC's negotiating order will allow the unit employees to express, or refrain from expressing, their desire to be represented by the employee organization which is presently their majority representative and will thus determine whether the Association is indeed defunct as an entity. For all that the record reveals, the present members of the negotiating unit might be eager to become members of the Association and have it engage in collective negotiations on their behalf but are merely waiting for the protection of a court decree before openly asserting that interest. Equally possible is the opposite situation, where post-enforcement repudiation of the Association by the present employees will seal its doom. A denial of enforcement of PERC's order by this Court to negotiate in good faith with the Association precludes the

occurrence of the former situation; granting enforcement will have no such effect on the latter, as the employees remain free, notwithstanding enforcement, to act in accordance with their own desires concerning representation. In such circumstances, we believe that the appropriate course of action is to grant enforcement of PERC's negotiating order so that the representational situation at the Galloway Township Board of Education may follow the course which subsequent events will reveal is the one desired by the persons whose interests the Act is primarily designed to further — the employees. The future will tell whether enforcement of PERC's order was an empty gesture or provided the opportunity for the meaningful expression of the representational desires of the present secretaries. Enforcement of the negotiating order will be conducive to that expression while not preclusive of the employees' ability to repudiate the Association if they so desire. Only such a result will restore, as much as possible, the *status quo* which existed prior to the Board's commission of the unfair practices which disrupted the natural development of employee representation in Galloway Township.

If no request to engage in collective negotiations is made after enforcement, the Board will be in compliance with PERC's order to the extent possible under the circumstances. If such a request is made, it will be for PERC to determine in compliance proceedings, see *N. J. A. C.* 19:14–10.1 *et seq.*, whether that request is a *bona fide* one which will trigger the Board's obligation under PERC's order to negotiate with the Association.

In short, the fact that six of the seven original secretaries represented by the Association no longer work for the Board does not constitute a dissolution of the Association precluding enforcement of PERC's order that the Board negotiate *upon request* with the Association. The Association remains a potentially viable entity so long as the jobs encompassed in the unit it represents continue to exist. In such circumstances, compliance with PERC's negotiating order could be

possible, depending upon post-enforcement events. If a request to negotiate is made, the Board will have someone with whom it can negotiate. The Appellate Division therefore erred in relying upon the alleged impossibility of compliance as the basis for its holding that the question of enforcement of PERC's order was moot.

We are concerned that the present employees may not be aware of their right to avail themselves of proceedings under the Act to reject the Association as their majority representative if that is their desire. If that is the case, the saving rationale for enforcement of a negotiating order despite the employee organization's possible loss of majority support is undermined. We believe that the solution to this problem devised by a federal appeals court in *NLRB v. Drives, Inc.*, 440 *F.* 2d 354 (7 Cir. 1971) (per Justice, then Judge, Stevens) is appropriate in cases where PERC negotiating orders are enforced. After stressing the importance of the employees' understanding their right to a secret ballot election and the undesirability of forcing them to rely on the union or the employer for an explanation of that right, the court held that the NLRB's order would be

* * * modified to include provision for a notice to the employees advising them of their independent right to petition for a new election. The exact terms of the notice, including the specification of the time when an employee petition may be filed, we leave to the discretion of the [NLRB].

[440 *F.* 2d at 367–68 (citations omitted)]

We believe this approach is sound and adopt it herein. Providing such notice to the employees will promote their informed exercise of their statutory rights and will enhance the likelihood that whatever occurs after enforcement of the negotiating order will accurately reflect their desires concerning representation.

 Finally, with regard to the enforcement of PERC's cease and desist orders, we note that the first requires the Board to refrain generally from interfering with the exercise

of statutory rights by its employees.[5] This order expressly runs in favor of the unit employees who are presently employed or may be employed in the future by the Board. Enforcement of such an order will provide the employees with an additional safeguard if they choose to avail themselves of their organizational rights under the Act. We cannot say on the present record that there is no conceivable likelihood of repetition of the Board's unlawful conduct such as would render enforcement of this order inappropriate. *See Galloway Tp. Bd. of Ed. v. Galloway Tp. Ed. Ass'n., supra,* 78 *N. J.* 25 (1978); *NLRB v. Raytheon Co.,* 398 *U. S.* 25, 90 *S. Ct.* 1547, 26 *L. Ed.* 2d 21 (1970). The other two cease and desist orders are contingent upon the resumption of collective negotiations between the Board and the Association. Their enforcement is essential because of the possibility that the request for negotiation required by PERC's negotiating order will be made. In that event, repetition of the Board's refusal to negotiate in good faith or its unilateral alteration of working conditions during the course of any collective negotiations which may ensue is not impossible.

The portions of the judgment of the Appellate Division appealed from are reversed. The portion of PERC's order not enforced by the Appellate Division are, as modified herein, enforced.

*For reversal* — Chief Justice HUGHES, Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER and Judge CONFORD — 7.

*For affirmance* — None.

---

[5]This particular order, see *ante* at 6–7, is couched in language identical to that contained in *N. J. S. A.* 34:13A–5.4(a)(1) and does not refer specifically to the unfair practices adjudicated. Although not at issue in this appeal, we note that as presently worded the order arguably embraces more than the particular conduct found to constitute a violation of the Act. It might be appropriate for PERC to formulate orders of this type with greater specificity.