Justice ALBIN,
dissenting.
The majority opinion sweeps away nearly fifty years of this Court’s public-sector labor jurisprudence, giving municipal employers the unilateral power to reduce the wages and hours of public employees promised in collective negotiations agreements. Before today, the cardinal principle guiding public-sector labor negotiations had been that the wages and hours of public workers are subject to negotiation — not to a public employer’s fiat. The simple precept that wages and hours are mandatorily negotiable is a common refrain not only in this Court’s opinions, but also in the decisions of the Appellate Division, and the Public Employment Relations Commission (PERC).
In the name of a furlough, two municipalities reduced the wages and standard of living of an entire public-employee workforce unit in violation of the Employer-Employee Relations Act (EERA). Another municipality cut in half the hours and salaries of three workers, thus depriving them of health insurance. Each municipality could have laid off one to three workers to achieve its budgetary goal, which was to increase the municipal surplus. Instead, the municipalities chose to breach their collective negotiations agreements with their employees’ unions. In all three cases, PERC — the public body empowered to enforce the EERA — ruled that the unilateral actions of the municipalities contravened the EERA and the principle that wages and hours are mandatorily negotiable. The majority affirms the overthrow of all three PERC decisions.
The majority’s endorsement of furloughs by fiat in non-emergent circumstances is a dismal sign for the future of public-sector collective negotiations. The temporary regulation promulgated by the Civil Service Commission on which the majority relies does not change the equation. When public employers can unilaterally *349 reduce wages and hours of employees, there is not much left to negotiate. Because the majority’s decision undermines the very foundation of collective negotiations, which is at the heart of the EERA, I respectfully dissent.
I.
A.
The Borough of Belmar and a local affiliate of the Communication Workers of America (CWA), which represents employees in Belmar’s public-works department, signed a collective negotiations agreement (CNA) effective January 1, 2005 through December 31, 2009. That agreement provided that the workweek for each employee would be forty hours and that every employee would receive a 3.9% salary increase in 2005 and a 4.0% increase each year from 2006 through 2009. In 2008, Belmar’s budget surplus declined from $1,630,802 to $1,284,563. To offset the decrease in the surplus, Belmar requested that its employees forgo their 4% salary increase for 2009. The public-works department employees demanded that Belmar adhere to its agreement.
Taking the my-way-or-the-highway approach, Belmar furloughed the workers one day per week from October 6, 2009 through December 15, 2009, wiping out their 4% salary increase for 2009. Belmar could have achieved the same savings by laying off just one worker. Instead, it chose to reduce the hours and wages of the entire bargaining unit in violation of its agreement.
B.
The Township of Mount Laurel and an affiliate of the American Federation of State, County and Municipal Employees, AFL-CIO (AFSCME), which represents the Township’s blue-collar workers, entered into a CNA that ended on December 31, 2008. The agreement remained in effect after December 31, while the parties negotiated a new contract. The agreement set forth the work hours and wages of each employee.
*350 In 2009, Mount Laurel’s budget surplus declined to $600,000. To increase the surplus, the Township asked its blue-collar workers to accept a voluntary furlough of eight days over an eight-month period. The workers declined the offer. Mount Laurel then involuntarily furloughed those employees for eight days — a savings equivalent to laying off three employees.
C.
The Borough of Keyport and a local affiliate of the AFL-CIO, which represents the Borough’s clerical employees, entered into a CNA effective from January 1, 2008 through December 31, 2010. The agreement set forth each employee’s work hours and wages, including a salary increase. The agreement provided that the newest employees would be laid off first, if layoffs were necessary.
Keyport experienced a decline in its budget surplus over a six-year period. In 2009, in response to its depleted surplus, the Borough took certain steps, which involved cutting in half the hours and wages of three clerical employees. Halving the salaries of those employees also resulted in the cancellation of their health benefits. The unauthorized actions taken by the Borough violated the CNA.
D.
In all three cases, PERC found that the municipalities engaged in unfair labor practices by eschewing negotiations and peremptorily decreasing the hours and wages of the targeted employees. Relying on this Court’s jurisprudence, PERC observed that “ ‘surely working hours and compensation are terms and conditions of employment within the contemplation of the Employer-Employee Relations Act.’ ” Borough of Belmar, P.E.R.C. No. 2011-34, 36 NJPER 405, 407 (2010) (quoting Bd. of Educ. of Englewood v. Englewood Teachers Ass’n, 64 N.J. 1, 6-7, 311 A.2d 729 (1973)). PERC determined that the municipalities could not justify their unilateral actions in violating their contractual commitments. For example, in the case of Belmar, PERC held that *351 “[t]he Borough has not asserted that reducing the workweek rather than laying off a single employee was needed to keep any programs running or to achieve any governmental policy purpose.” Id. at 408. In Township of Mount Laurel, P.E.R.C. No. 2011-35, 36 NJPER 409, 411 (2010), PERC found that the Township did not “produce[ ] any evidence to establish that it is without alternatives to achieve the same savings without furloughing its employees nor has it shown that any operations or programs would be hindered if it had to layoff employees to achieve the same budgetary savings instead of implementing temporary layoffs.” PERC, in effect, concluded that the furloughing of employees was a disguise for driving down the wages of entire work units of employees.
PERC is a specialized administrative agency designated by statute to interpret, implement, and enforce the EERA. N.J. Tpk. Auth. v. AFSCME, Council 73, 150 N.J. 331, 335, 696 A.2d 585 (1997) (citing N.J.S.A. 34:13A-5.2). PERC brings expertise to the resolution of public-body labor disputes, City of Hackensack v. Winner, 82 N.J. 1, 24, 410 A.2d 1146 (1980), and its “interpretation of the [EERA] is entitled to substantial deference,” N.J. Tpk. Auth., supra, 150 N.J. at 352, 696 A.2d 585. A PERC ruling should not be overturned “ ‘unless it is clearly demonstrated to be arbitrary or capricious.’ ” In re Hunterdon Cnty. Bd. of Chosen Freeholders, 116 N.J. 322, 329, 561 A.2d 597 (1989) (quoting State v. Prof'l Ass’n of N.J. Dep’t of Educ., 64 N.J. 231, 258-59, 315 A.2d 1 (1974)).
E.
The Appellate Division turned a blind eye to the deference owed to PERC decisions. It reversed, finding that an emergency civil service regulation authorized the Civil Service Commission to approve the municipalities’ furlough and wage-and-hour-reduction plans. Relying on prong two (preemption) and prong three (managerial prerogative) of the test set forth in Local 195, IFPTE v. State, 88 N.J. 393, 404-05, 443 A.2d 187 (1982), the panel held *352 that “the decisions to furlough and demote employees were nonnegotiable policy determinations.”
The majority concedes that the Appellate Division erred in finding that the civil service regulation preempted PERC. Ante at 340, 118 A.3d at 1056. Accordingly, the only remaining issue is whether — as the majority argues — the municipalities were exercising a managerial prerogative that allowed them to trump the principle guiding all collective negotiations: wages and hours are mandatorily negotiable. If the majority is correct, then nearly fifty years of our jurisprudence is wrong. This Court has never held that the process of collective negotiations of wages and hours can be bypassed by a public employer unilaterally arrogating to itself the power to reduce wages and hours.
II.
“Public employees are given comprehensive rights under the Employer-Employee Relations Act.” In re Hunterdon Cnty. Bd. of Chosen Freeholders, supra, 116 N.J. at 327, 561 A.2d 597; see also N.J.S.A. 34:13A-1 to 34:13A-43. Perhaps foremost among those rights is the right to freely negotiate with a public employer over the terms and conditions of employment. N.J.S.A. 34:13A-5.4(a)(5). The EERA forbids a public employer from “[rjefusing to negotiate in good faith with a majority representative of employees in an appropriate unit concerning terms and conditions of employment.” Ibid. Public-sector labor negotiations break down into two categories: ‘“mandatorily negotiable terms and conditions of employment and non-negotiable matters of governmental policy.’ ” Local 195, supra, 88 N.J. at 402, 443 A.2d 187 (quoting Ridgefield Park Educ. Ass’n v. Ridgefield Park Bd. of Educ., 78 N.J. 144, 162, 393 A.2d 278 (1978)).
Whatever else terms and conditions of employment may mean, it has been universally accepted that wages and hours are terms and conditions of employment that public employers must negotiate with their employees. See id. at 412, 443 A.2d 187; State v. State Supervisory Emps. Ass’n, 78 N.J. 54, 67, 393 A.2d 233 (1978) *353 (noting that “working hours” and “compensation” are “the essential components of terms and conditions of employment” and must be negotiated); Galloway Twp. Bd. of Educ. v. Galloway Twp. Ass’n of Educ. Sec’ys, 78 N.J. 1, 6-8, 393 A.2d 207 (1978) (concluding that reducing full-time secretarial positions to part-time violated public employer’s obligation to negotiate); Bd. of Educ. of Englewood, supra, 64 N.J. at 6-7, 311 A.2d 729 (“Surely working hours and compensation are terms and conditions of employment within the contemplation of the Employer-Employee Relations Act.”); Burlington Cnty. Coll. Faculty Ass’n v. Bd. of Trs., 64 N.J. 10, 12, 311 A.2d 733 (1973) (noting that “days and hours of work by individual faculty members ... are mandatorily negotiable under the [Employer-Employee Relations Act]”); Boonton Bd. of Educ., P.E.R.C. No. 2006-98, 32 NJPER 239, 240 (2006) (“The number of hours an employee works and the employee’s compensation and fringe benefits are all mandatorily negotiable terms and conditions of employment.”); Gloucester Cnty., P.E.R.C. No. 93-96, 19 NJPER 244, 245-46 (1993) (noting that New Jersey “Supreme Court has consistently held that work hours are a mandatorily negotiable term and condition of employment” and that “short of abolishing a position, an employer must negotiate over reductions in the work year, work week, and work day of unit positions”); Stratford Bd. of Educ., P.E.R.C. No. 90-120, 16 NJPER 429, 430 (1990) (“[W]ork hours and compensation ... [are] ... mandatorily negotiable”); Bayshore Reg. Sewerage Auth, P.E.R.C. No. 88-104, 14 NJPER 332, 333 (1988) (“A public employer, short of abolishing a position, must negotiate over reductions in hours and compensation.”); Willingboro Bd. of Educ., P.E.R.C. No. 86-76, 12 NJPER 32, 33 (1985) (concluding that cutting wages and hours by one-third of public employee cafeteria workers violated EERA and required mandatory negotiations); State of New Jersey (Ramapo State Coll.), P.E.R.C. No. 86-28,11 NJPER 580, 581 (1985) (“[A]n employee’s work year is a mandatorily negotiable term and condition of employment.”); Cherry Hill Bd. of Educ., P.E.R.C. No. 85-68, 11 NJPER 44, 46 (1984) (“It has been well established since the first precedents *354 interpreting the New Jersey Employer-Employee Relations Act that working hours are mandatorily negotiable.”); Sayvreville Bd. of Educ., P.E.R.C. No. 83-105, 9 NJPER 138, 140 (1983) (“[A]n employer violates its duty to negotiate when it unilaterally alters an existing practice or rule governing a term and condition of employment, such as the length of the work year or the amount of an employee’s salary....”); Hackettstown Educ. Ass’n, P.E.R.C. No. 80-139, 6 NJPER 263, 263 (1980) (“[PERC] has consistently held that the length of the work year (or the abolition of 12 and 11 month positions and the creation of 10 month positions) is a mandatory term and condition of employment.” (Footnotes omitted)).
Not just in New Jersey, but elsewhere, it has been a categorical imperative of public-sector collective bargaining that wages and hours must be negotiated. See Paul M. Secunda et al., Mastering Labor Law 185-87 (2014) (noting that wages and hours are mandatorily negotiable in public-sector collective bargaining); see also Nat’l Educ. Ass’n v. Bd. of Educ., 212 Kan. 741, 512 P.2d 426, 433 (1973) (concluding that “terms and conditions of professional service” of public employees included wages and hours); Detroit Police Officers Ass’n v. City of Detroit, 61 Mich.App. 487, 233 N.W.2d 49, 52 (1975) (noting that wages and hours “are mandatory subjects of collective bargaining” in public-employment setting); Clark Cnty. Sch. Dist. v. Local Gov’t Emp.-Mgmt. Relations Bd., 90 Nev. 442, 530 P.2d 114, 117-18 (1974) (noting that public employer must negotiate hours and wages with employees).
The Local 195 scope-of-negotiations test is not intended to resolve an issue about which there can be no dispute — the negotiability of wages and hours in the public-sector setting.[1] The test is *355 intended for matters, unlike wages and hours, that fall in the gray area between what is negotiable and non-negotiable. This point is made clear throughout our jurisprudence. If a matter clearly falls within the category of wages and hours, the inquiry is over. Thus, “[wjhere the condition of employment is significantly tied to the relationship of the annual rate of pay to the number of days worked, then negotiation would be proper.” Bd. of Educ. of Woodstoum-Pilesgrove Reg’l Sch. Dist. v. Woodstown-Pilesgrove Reg’l Educ. Ass’n, 81 N.J. 582, 591, 410 A.2d 1131 (1980).
In Woodstoum-Pilesgrove, we held that negotiation was required when a board of education unilaterally extended a single school day by two hours without any additional compensation for the school’s teachers. Id. at 593-94, 410 A.2d 1131. Similarly, in Board of Education of Englewood, supra, 64 N.J. at 3, 6-7, 311 A.2d 729, we held that the unilateral extension of teachers’ work day by an hour and three quarters without additional pay undoubtedly concerned “terms and conditions of employment within the contemplation of the Employer-Employee Relations Act” and had to be negotiated. Moreover, in Piscataway Township Board of Education v. Piscataway Township Principals Ass’n, 164 N.J.Super. 98, 101, 395 A.2d 880 (App.Div.1978), the Appellate Division explained:
[Tjhere cannot be the slightest doubt that cutting the work year, with the consequence of reducing annual compensation of retained personnel who customarily, and under the existing contract, work the full year (subject to normal vacations), and without prior negotiation with the employees affected, is in violation of both the text and the spirit of the Employer-Employee Relations Act.
Conversely, outside of the realm of wages and hours, we have held that a public employer is not required to negotiate matters that fall squarely within managerial prerogatives. See, e.g., Local 195, supra, 88 N.J. at 406-07, 417, 443 A.2d 187 (concluding that subcontracting as well as transfer or reassignment of employees are non-negotiable subjects); Paterson Police PBA Local No. 1 v. City of Paterson, 87 N.J. 78, 98, 432 A.2d 847 (1981) (holding that municipal decisions regarding organization and deployment of police forces are not negotiable); State Supervisory Emps. Ass’n, *356 supra, 78 N.J. at 84, 393 A.2d 233 (finding that seniority relating to layoffs, recall, bumping and reemployment is preempted by civil service laws and therefore not negotiable).
The involuntary furloughing of an entire work unit — cutting employees hours and wages, as occurred in Belmar and Mount Laurel — is incompatible with this Court’s holdings in Woodstowrir-Pilesgrove and Board of Education of Englewood and the Appellate Division’s holding in Piscataway Township Board of Education. The involuntary halving of hours and wages of clerical workers is also incompatible with those cases.
III.
That the EERA and our case law require hours and wages to be negotiated does not place municipalities and other public entities in a budgetary strait jacket when revenues decline. The Civil Service Act provides that “permanent employee[s] may be laid off for economy, efficiency or other related reason.” N.J.S.A. 11A:8-1(a). In Belmar, the laying off of a single employee would have achieved the same savings as the furloughing of an entire work unit — and without violating the collective negotiations agreement. In Mount Laurel and Keyport, the municipalities had the option of laying off employees to accomplish the necessary savings rather than reducing the wages of workers.
In overturning the three PERC decisions, the majority relies on the emergency civil service regulation that was promulgated in March 2009 and repealed in December 2009, even though the municipalities did not rest their arguments on that regulation.[2] *357 Ante at 320, 118 A3d at 1044. In essence, the emergency regulation defined a layoff as synonymous with a furlough. That regulation allowed a municipality to submit a furlough plan for acceptance to the Civil Service Commission. Acceptance of the plan, however, did not mean a furlough was not negotiable.
A public employer’s compliance with civil service regulations is not the end of the process, for the public employer must also satisfy the requirements of the EERA. Prosecutor’s Detectives & Investigators Ass’n v. Hudson Cnty. Bd. of Chosen Freeholders, 130 N.J.Super. 30, 46, 324 A.2d 897 (App.Div.) (“Our duty is to read the Civil Service Act and the Employer-Employee Relations Act, as applied to the situations before us, so that both are harmonized and each is given its appropriate role.”), certif. denied, 66 N.J. 330, 331 A.2d 30 (1974).
Even the majority acknowledges that the regulation did not preempt the obligation of the municipality to negotiate. Ante at 340, 118 A.3d at 1056. Instead, the majority submits that — based on the emergency regulation — the municipalities were exercising a managerial prerogative and thus had the right to unilaterally furlough employees. Ante at 347,118 A.3d at 1060. The majority focuses on prong three of the Local 195, supra, test: “a subject is negotiable between public employers and employees when ... a negotiated agreement would not significantly interfere with the determination of governmental policy.” 88 N.J. at 404, 443 A.2d 187.
However, the majority cannot point to any true emergency that compelled the municipalities to choose furloughs over traditional layoffs. As noted earlier, the layoff of just one employee in Belmar and the layoff of just three employees in Mount Laurel would have met the budgetary needs of those municipalities. *358 Reducing the wages and hours of an entire unit was an exercise of raw political power by the municipalities and is incompatible with the EERA’s requirement that the terms and conditions of employment be resolved through negotiation.
The majority’s reliance on the emergency civil service regulation appears to be nothing more than preemption in disguise. The regulation should have been harmonized with the purposes animating the EERA. Here, furloughing is merely a name invoked to justify the unilateral cutting of wages and hours of employees — an action previously unacceptable under our jurisprudence.
Clearly, we live in difficult economic times in which municipalities struggle to balance their budgets. But the problems facing Belmar, Mount Laurel, and Keyport were and are no different than those facing a multitude of other municipalities. None of the municipalities in this case confronted an economic state of emergency so severe that it was left without other reasonable options than furloughing entire units of public employees.
By sanctioning the path taken by these municipalities, the majority has struck a stake in the heart of the collective negotiations process. A collective negotiations agreement is of little value when a municipality can unilaterally reduce the hours and wages of public employees by calling it a furlough. The power to furlough, moreover, is a powerful club that can be wielded at the negotiations table to coerce concessions.
In the end, there is a right way and a wrong way to achieve economy and efficiency consistent with the EERA. Cutting wages and hours of an entire work unit in violation of negotiated agreements — by whatever name — is not in keeping with our time-honored jurisprudence and the EERA.
IV.
Before the Appellate Division, PERC filed a thirty-three page brief arguing for affirmance of the three PERC decisions. In a March 2011 supplemental letter to the Appellate Division, PERC *359 wrote: “The Commission’s management, labor, and public members applied their knowledge of negotiations practices concerning compensation, workweek, and work schedules and agreed that the Borough had an obligation to negotiate the reduction in workweek, work year and compensation of the CWA unit members. That expert judgment should be accepted.” In a letter to the Clerk of this Court concerning the present appeals, a Deputy Attorney General, on behalf of PERC’s general counsel, wrote: “[T]he Commission takes no position on the Petitions for Certification” filed by the municipalities. PERC filed its Appellate Division brief with this Court. Then, with no prior notice given to this Court, PERC’s general counsel made a complete about-face, announcing at oral argument that PERC had changed its mind and no longer stood behind the PERC decisions before us. In an exercise of circular reasoning, counsel pointed to a 2013 PERC decision, Robinsville Township Board of Education, P.E.R.C. No. 2014-30, 40 NJPER 253, 253-54 (2013), upholding the involuntary furlough of three teachers, which in turn relied on the very Appellate Division opinion in this case, whose approach PERC had strenuously opposed.
Merely because the composition of PERC has changed dramatically during the current administration does not mean that our standard of review should change. Counsel cannot be faulted for taking his orders from the newly composed PERC. But our review is from the PERC decisions before us. Deference applies to those decisions, regardless of the change of personnel on PERC. The majority is mistaken in accepting PERC’s changed position to erode the traditional standard of review of the cases on appeal.
Y.
By overruling the PERC decisions and endorsing the furloughs in these cases, even under the emergency civil service regulation, the majority has held that a negotiated agreement on wages and hours significantly interferes with the determination of government policy. That holding is not only contrary to our jurispru *360 dence, it is also in conflict with the legislative policy enunciated in the EERA. Collective negotiations mean nothing if wages and hours are not on the table for discussion. One can only hope that the damage the majority inflicts on the collective negotiations process will be limited to the period the emergency civil service regulation was in effect.
I therefore respectfully dissent.
For affirmance as modified — Justices LaVECCHIA, PATTERSON, SOLOMON and Judge CUFF (temporarily assigned) — 4.
For Dissent — Justice ALBIN — 1.
Not Participating — Chief Justice RABNER and Justice FERNANDEZ-VINA.

 In assessing whether a matter is negotiable or non-negotiable, the Local 195 test requires a determination whether "(1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy." Local 195, supra, 88 N.J. at 404, 443 A.2d 187.

 The emergency regulation provided that:
An appointing authorify in State or local service may institute a temporary layoff for economy, efficiency or other related reasons. A temporary layoff shall be defined as the closure of an entire layoff unit for one or more work days over a defined period or a staggered layoff of each employee in a layoff unit for one or more work days over a defined period. A temporary layoff shall be considered a single layoff action even though the layoff of individual employees takes place on different days during the defined period. The *357 defined period shall be set forth by the appointing authority in its temporary layoff plan; however, in a staggered layoff, the maximum period to stagger one day off shall not exceed 45 days.
[N.J.A.C. 4A:8-l.lA(a) (repealed December 21, 2009).]