UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPEFITTING INDUSTRY OF the UNITED STATES AND CANADA, AFL–CIO–CLC, LOCAL NO. 198, Petitioner Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent Cross-Petitioner.

No. 84–4196

Summary Calendar.

United States Court of Appeals, Fifth Circuit.

Nov. 30, 1984.

---

Spedale, Sanders & Pennington, A. Foster Sanders, III, Baton Rouge, La., for petitioner cross-respondent.

Elliott Moore, Deputy Assoc. Gen. Counsel, N.L.R.B., Washington, D.C., for respondent cross-petitioner.

Fred A. Lewis, Reg. Director, N.L.R.B., New Orleans, La., for other interested party.

Before WILLIAMS, JOLLY and HILL, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This case is before the court upon the petition of the union filed pursuant to section 10(f) of the NLRA to review and set aside an order of the National Labor Relations Board (Board) issued against the un-

ion on February 29, 1984, and reported at 268 NLRB No. 195. The Board has filed a cross-application for enforcement of its order. We enforce the order of the Board without prejudice to the union to challenge the compliance procedures or individual awards.

## I.

Local 198 (the union) has approximately 4,000 members who are plumbers and other related tradesmen. The union's hiring hall in Baton Rouge, Louisiana, is recognized as the exclusive referral system in various collective bargaining agreements to which the union or its parent international is signatory. The rules governing the operation of the hiring hall are codified by the union in "Working Rules, By-laws" (the rules); the rules are not determined by the collective bargaining agreements.

The rules provide that there shall be nondiscriminatory selection for all applicants for referral, that applicants must sign and date the appropriate out-of-work list according to their trade classifications, that applicants will retain their places on the list until dispatched, and that "all applicants must be present when a referral is made." The rules also establish four referral lists, but for the purposes of this case only Group "A" and Group "B" are relevant. Group "A" consists of all qualified journeymen who have been employed for at least four out of the past five years by an employer abiding by an agreement with the union or have been under training in a formally approved program and who have lived for at least five years within the local construction labor market. Group "B" consists of all qualified journeymen who have been employed for at least four out of the past five years by designated employers. All persons in the "B" group are required to sign the appropriate list each day in order to be eligible for referral. Applicants in Group "A" are to be referred under the rules, and when this group is

exhausted, applicants from Group "B" are to be referred. In fact, however, the Board found that the union has ignored the rules defining the Group "A" and Group "B" referral classes, and that Group "A" essentially consists of Local 198 members and Group "B" of all remaining applicants, travelers and nonmembers.[1]

Robert Anderson, the union's assistant business agent, testified that the "A" list is restricted to union members; that in giving referrals to "A" applicants, the union first clears the auditorium where jobs are awarded of travelers and nonmembers, in conformity with a sign posted outside the entrance to the auditorium that reads, "198 Members Only"; and that "B" applicants receive referrals only after the union exhausts the "A" list.

Anderson testified that he knew of no instances where an individual who had become a member of the union had been removed from the "A" list because of failure to continue to meet the prerequisite employment requirement. A substantial number of the union's members who had not worked through the union hall during the previous two years were maintained on the "A" list, in derogation of the rules.

To meet emergency situations, the union maintains an emergency list from which it calls the first listed qualified individuals, even if not in the union hall at the time. During the six months before the hearing, the union received approximately twelve calls for emergency referrals, all of which went to the union's members, the only job applicants whose addresses are on file with the union.

As a result of a subpoena enforcement proceeding brought by the General Counsel to require the production of certain of the union's work referral system records, it was learned that the "B" registration book had been suspended and access to that book denied to work referral applicants from October 1, 1981 through February 8, 1982, and again from September 30, 1982,

---

1. A traveler is a member of a plumbers local union other than Local 198; a nonmember has no affiliation with a local union at all.

to the time of the hearing. During those periods, no records of "B" registrants were kept and none was permitted to register. Thus, respondents kept no Group "B" referral records for approximately ten months of the fourteen-month period covered by the subpoena.

J.C. Hicks, the union's business manager, and Anderson explained that the use of the "B" book had been suspended during the two indicated periods for opposite reasons. The "B" register was discontinued during the first period because that had been an interval of peak employment. There had been no need for "B" applicants to sign the register as there was work for all. On the other hand, the "B" book had been suspended since September 30 because there was hardly any work, and, according to Hicks, almost 1,900 "A" members were idle at the time of the hearing. To have put out the "B" book in the circumstances would merely have served to provide potential "B" applicants with false encouragement.

"B" applicant Wilbur Thomas, corroborated by traveler Frederick Everson, testified that, under the union's hiring-hall policy, he was prevented from registering in the "A" book, from being in the auditorium when "A" members received work referrals, and was consigned, with other "B" applicants, to whatever work remained. Thomas had not received work through the respondent's hall since April 22, 1982, although he had signed the "B" book twenty-five to thirty times. Everson registered at the hall four or five times without referral after his March 30 lay-off from his last union-referred job, after which he gave up.

Thomas and Everson had both previously filed charges against the union for discriminatory practices. These charges had been voluntarily withdrawn. All of the registrations by Thomas and Everson noted above post-date the termination of the previous claims. Thomas and Everson were both permitted to give testimony as to matters occurring both before and after the settlement of their previous claims. Their testi-

monies partially corroborated Anderson's testimony.

The General Counsel introduced various statistics which he claims support his position. Only 11.8 percent of all referrals were Group "B" referrals in the period from October 19, 1981, through October 27, 1982, although there is no indication of what percentage of the total applicant pool consisted of individuals prohibited from signing the "A" book. During the period the "B" book was suspended, over 1,600 fitters and welders were referred for work, but only a few travelers and nonmembers were referred. From February 19 through September 30, there were sixty-three additional days when travelers and nonmembers who were journeymen fitters and welders were not referred, while members in those categories received work. Between April 22 and September 30, the respondent referred 894 member pipefitters and 492 member welders in comparison to the 5 pipefitters and 127 welders referred from Group B. The union disputes the probative value of these statistics, an issue we address below.

The union argues that these statistics show that rather than having discriminated against nonmembers and travelers, it followed a practice of referring them for work, curtailed only because of severe unemployment which developed in the industry. The union justifies its requiring Group "B" job applicants to sign their out-of-work list daily while member applicants need register only once to be referred, on the ground that nonmembers and travelers, unlike members, are not a stable part of the area work force with established addresses.

The union further explains that any propensity to favor members over nonmembers and travelers merely reflects its view that members, because of their training and experience, are more qualified. The union argues that its members generally have received formal apprenticeship training.

The overwhelming majority of travelers and nonmembers who signed the "B" book

on or after April 22 did so from one to three times. A number, however, registered repeatedly. Everson claimed he had signed four or five times, and Thomas registered for work twenty-nine times. Neither was referred following these registrations. Other frequent "B" book registrants were not referred, including men who signed over twenty times in a four-month period.

Testimony by Anderson, Hicks and others indicated that James Brewer, who filed the original charge, had been denied work repeatedly because of his failure to pay an internal union fine even though he was a nonmember. This was determined by the Board to be an independent violation of the Act, a determination the union is not contesting. Brewer frequently signed the "B" book. The union contests the Board's finding that Brewer has been discriminated against in referrals because he is a nonmember. Brewer had in the past received referrals from the union hall.

## II.

The complaint in this case is pursuant to charges filed by James Brewer, acting as an individual in his own behalf, and a complaint issued by the Board on June 3, 1982. The complaint, as amended at the hearing, alleges that the union violated section 8(b)(1)(A) of the National Labor Relations Act by informing Brewer that the union was filing internal union charges against him for working for a nonunion contractor, by threatening to refuse to refer him for employment because he was considered a "habitual offender" who had not paid union fines previously imposed by the union, and by informing Brewer that he had been denied referral for employment because he did not pay such fines. The complaint further alleges that the respondent has violated section 8(b)(1)(A) and (2) of the Act by refusing to refer Brewer for employment because he had not paid an outstanding union fine; by discriminating against Brewer and other travelers and nonmembers in the making of work-referrals because of lack of membership in the union; by failing or refusing to make its hiring-hall-work rules available to all applicants; and by failing to use objective standards in referring nonmember and traveler work applicants.

Following a hearing at which testimony was taken and other evidence introduced, the administrative law judge (ALJ) entered an order [2] requiring the union to cease and desist from various unfair practices and requiring certain affirmative action necessary to effectuate the policies of the Act. The portion of the order to which the union most vigorously objects is the affirmative requirement that the union make whole all nonmember and traveler applicants for referral for any loss of earnings suffered because of the discrimination against them, leaving the identity of the discriminatees to be determined in the compliance stage of the proceeding. The union also maintains that the record does not support a finding of discriminatory operation of the hall, that the administrative law judge improperly relied upon evidence associated with the informally settled unfair-labor-practice charges of Messrs. Everson and Thomas, that due process was denied the union by failure to give reasonable notice of an identifiable or recognizable group of alleged discriminatees, that newspaper publication of the Board's order would be unfair, and that there was no independent evidence that Messrs. Everson and Thomas were discriminated against after the settlement of their previous charges, or that Brewer was discriminated against because of his nonmember status.

The Board accepted, with only slight modification, the ALJ's findings and order.

## III.

The union disputes the Board's finding that it discriminated against travelers and nonmembers in the operation of its hiring hall. This finding is conclusive if supported by substantial evidence in the record as a whole; a court will not displace

2. *See* appendix.

an adequately supported Board determination even if it would prefer a different choice if the matter were before it *de novo. Universal Camera v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Sturgis Newport Business Forms v. NLRB*, 563 F.2d 1252 (5th Cir.1977). A review of the record here indicates that there is substantial evidence supporting the Board's finding that Local 198 operated its hall in a discriminatory fashion in violation of section 8(b)(2) and (1)(A) of the National Labor Relations Act (the ·Act), 29 U.S.C. § 158(b)(2) and (1)(A).

First, Robert Anderson, Local 198 Assistant Business Agent, admitted that the "A" list was restricted to union members; that in giving referrals to "A" applicants, the union first cleared the auditorium where jobs are awarded of nonmembers in conformity with a sign posted outside the entrance to the auditorium reading "198 members only," and that "B" applicants received referrals only after the union exhausted the "A" book.

Anderson's testimony was corroborated in part by Wilbur Thomas, Frederick J. Everson, Jr., James L. Brewer, and J.C. Hicks, the union business manager. The ALJ expressly found Anderson and Hicks to be credible witnesses.

Second, the union admits that only "B" book applicants were required to sign in every day. Since all applicants had to be present in the hall to accept work, this requirement was not adequately explained by the union's need to keep track of available applicants. The requirement was simply a burden on nonmembers and travelers, as was found by the ALJ.

Third, the union admits that the "B" book was discontinued for many months at a time in violation of its own procedures. The union's explanations for these lapses are not convincing of innocence. The union claims the "B" book was discontinued at one point because of a general business slowdown, but a reduction in business does not excuse discrimination against nonmembers.

Fourth, the union resisted producing "B" book records in defiance of a subpoena, only relenting when contempt proceedings for noncompliance were instituted. The union then admitted that no "B" records had been kept for extended periods of time.

Fifth, only members were given emergency work for six months before the hearing.

Sixth, the General Counsel produced statistical evidence consistent with the Board's finding of discrimination. The union disputes the probative value of these statistics. We agree with the union that these statistics should not be given much weight since they omit important data. For example, the statistics indicate that 11.8 percent of all referrals were Group "B" referrals from October 19, 1981 through October 27, 1982, but do *not* indicate what percentage of all applicants were in Group "B" during this period. Nevertheless, the statistics are entitled, perhaps, to some slight weight because they are at least suggestive of discrimination, the union pointed out no specific flaw in the evidence at trial, and presented no evidence indicating that the statistics were misleading. We are also mindful of the fact that the union's failure to maintain reasonable records, including the suspension of the "B" book, may have rendered the collection of accurate statistics difficult. We emphasize that we do not place any determinative reliance on these statistics.

The factors above substantially support the Board's finding that Local 198 intentionally operated its hiring hall according to discriminatory procedures.

■ The union urges that evidence associated with the informally settled unfair labor practice charges of Everson and Thomas should be barred as not providing a basis for a finding of "proclivity to violate the Act." The evidence in this case is sufficient to support the Board's finding of present discriminatory operation without any recourse to first finding Local 198 had a "proclivity to violate the Act" in the past. Anderson's testimony and other evidence is much more dispositive of the issue than is

the testimony of Thomas and Everson concerning their previous claims. The union further urges that the doctrine of collateral estoppel applies here to bar evidence associated with the previous claims, citing *Gulf States Manufacturing v. NLRB*, 598 F.2d 896 (5th Cir.1979). We do not agree; the prior complaints were voluntarily withdrawn and so lack finality, there is little privity between the prior complainants and the present class of discriminatees, and the present action involves more than discrimination against the two prior complainants. *See generally Parklane Hosiery v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

Since the record as a whole substantially supports the Board's finding, we affirm the determination of discriminatory operation of the hiring hall.

### IV.

■ The union maintains that the Board's award of make-whole relief to all nonmembers and traveler applicants injured by the discriminatory operation of the union hall is not consistent with precedent, citing *International Longshoremen's Ass'n, AFL–CIO (West Gulf Maritime Ass'n)*, 194 NLRB 1027 (1972) (refusing administrative judge's request for make-whole relief for all but named discriminatees on the grounds that there was no evidence that anyone other than the named discriminatees had been injured). In rebuttal, the Board principally relies on *Boilermakers Local Union No. 154, AFL–CIO (Western Pennsylvania Service Contractors Ass'n)*, 253 NLRB 747 (1980), *enfd.* 676 F.2d 687 (3d Cir.1982) (table) (granting make-whole relief to all applicants to discriminatorily operated union hiring hall who suffered loss, and leaving the determination of the discriminatees to the compliance stage). *Western Pennsylvania* distinguished *West Coast Gulf*, on the grounds that in *West Coast Gulf* there was no evidence that any unnamed individuals were damaged; in *Western Pennsylvania*, the General Counsel introduced specific evidence (including the "out-of-work book" in-

volved in the discrimination and reports of payments made to employees out of contractual benefit funds) that established a class of unnamed injured discriminatees. *Western Pennsylvania* at 748 n. 4. In the present case, the General Counsel has produced the hall's "A" and "B" books together with testimony by Anderson and others supporting the conclusion of actual discrimination against a class of individuals.

The union challenges the reliability of a statistical analysis that the General Counsel used to buttress his case, pointing out that the statistical analysis used in *Western Pennsylvania* was much more sophisticated and revealing. Even though we agree with this contention, Anderson's testimony concerning the actual assignment of jobs, the fact that emergency work was actually given to few nonmembers or travelers, and circumstantial evidence such as the signs on the wall and the "out-of-work" books all substantially support a finding of the existence of an injured class. The Board was correct in holding that *West Coast Gulf* is inapposite and that *Western Pennsylvania* is controlling.

### V.

■ The union contends it was denied due process because it was not provided with reasonable notice of an identifiable or recognizable group of alleged discriminatees for whom redress was sought. We do not agree.

Paragraph 13 of the original complaint alleges that the union:

> has given preference to its members in referrals to employers within its geographical jurisdiction with whom it has collective-bargaining agreements containing exclusive referral provisions, thereby discriminating against non-member applicants for employment based upon union membership and/or arbitrary, invidious or irrelevant considerations and causing and/or attempting to cause said employers to discriminate against such non-member applicants for employment in violation of Section 8(a)(3) of the Act [29 U.S.C. 158(a)(3)].

This paragraph alleges broad discrimination in the operation of the hiring hall in general, not just with respect to the named parties.

The principles of offensive collateral estoppel also weigh against the union's position on this issue. If the finding of general discriminatory operation of the union hall were upheld but redress given only to the named individuals, the union might nevertheless be barred from relitigating the discrimination issue by collateral estoppel. *Parklane Hosiery v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Such collateral estoppel effect is often appropriate in an administrative setting and none of the *Parklane Hosiery* policies seems to weigh against it here. *Mosher Steel Co. v. NLRB*, 568 F.2d 436 (5th Cir.1978). The procedure proposed by the Board of relegating the determination of the discriminatees to the compliance stage amounts to little more than permitting collateral estoppel effect to the finding of discriminatory operation of the union hall in that stage. The union may still contest individual awards and compliance procedures.

### VI.

■■■ The union claims the make-whole remedy is unduly harsh, unfair, and violates the purposes of the Act in that the remedy would serve to weaken or destroy it. We are mindful of the potential for abuse in the open-ended nature of the Board's remedy. Board grants of back pay are authorized under the Act, but in a case such as this one, the procedure for the award of the back pay may well determine whether the remedy becomes penal in nature; such a penal remedy is not permitted. *NLRB v. Strong*, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969). Moreover, the Board is not required to make the kind of inquiry into the extent of actual damages which conventional common law or equitable doctrines would require of a court. *Virginia Electric v. N.L.R.B.*, 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943). We leave it to the Board to take these considerations into account in fashioning

the individual awards it may make. We note that any award or group of awards which have the effect of fatally crippling the union may not effectuate the purposes of the Act. We further note that the requirement of section 10(b) of the NLRA may restrict the Board to awarding relief to only those applicants who were discriminated against within six months of the filing of the original complaint, although we do not decide this issue which has been neither briefed nor argued here.

We enforce the Board's order allowing the determination of the discriminatees in the compliance stage. However, the Board must articulate the reasons for its decisions in the compliance proceedings, and the Board's decision is affirmed without prejudice to the union to challenge the compliance procedures themselves or individual awards.

### VII.

■■■ The union's challenge to the Board's order that notice of the remedy be published in newspapers of general circulation must be denied. As pointed out above, the Board has broad discretion to formulate its remedies; a remedy must be upheld unless it violates the purposes of the Act. In the present case the class of discriminatees includes travelers and nonmembers, many of whom could not be expected to see posted notices or notices appearing in trade or union publications. *Iron Workers Local 480*, 235 NLRB 1511, 1514, *enf'd. mem.* 598 F.2d 611 (3d Cir.1979).

### VIII.

■■■ The Board's finding of discrimination against Everson and Thomas is substantially supported by the record independently of evidence associated with the informal resolutions of their previous claims. Both testified they had been prevented from signing the "A" book, that they had often signed the "B" book without referrals, and that their requests for copies of the rules of the hiring hall had not been satisfied. The union's assertion that Thomas made an off-the-record comment that he

had not been discriminated against is disputed by both the administrative law judge and the General Counsel. Moreover, Thomas signed the "B" book twenty-five to thirty times after the settlement of his claim, but received no referral. The amount of the redress to which these men are entitled was left to the compliance stage which is consistent with the Board's approach to the whole case.

Similarly, the fact that Brewer often signed the "B" book without receiving work supports the Board's determination that he was discriminated against. This does not mean he is entitled to monetary redress; that decision will not be resolved until the compliance stage.

## IX.

In conclusion, we enforce the Board's order in its entirety without prejudice to the union to challenge the compliance procedures or individual awards.

ENFORCED.

## APPENDIX

### ORDER

Respondent, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO–CLC, Local No. 198, its officers, agents, successors and assigns, shall:

1. Cease and desist from:

(a) Conveying to James L. Brewer that he would not be referred for employment through the Respondent's exclusive hiring hall system because of his failure to pay a union imposed fine leaved [sic] against him.

(b) Refusing to refer James L. Brewer, or any other employee, for employment through its exclusive hiring hall because of failure to pay a union-imposed fine leaved [sic] against him.

(c) Causing or attempting to cause any employers bound to use the Respondent's exclusive hiring hall as a source for employees, to discriminate against James L. Brewer or any other employees and/or

work applicants, in violation of Section 8(a)(3) of the National Labor Relations Act, because of their lack of membership in the Respondent, or for other arbitrary or invidious reasons.

(d) Failing to use objective, consistent standards in making referrals of nonmembers and travellers for employment through its exclusive hiring hall.

(e) Failing to furnish printed information, upon request, concerning its referral system rules to work applicants at its exclusive hiring hall.

(f) In any like or related manner, restraining or coercing employees in the exercise of rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action deemed necessary to effectuate the policies of the Act:

(a) Notify James L. Brewer, in writing, that it has no objection to referring him for employment through its exclusive hiring hall in his rightful order of priority, without regard to any unpaid union fines imposed against him.

(b) Make whole James L. Brewer, with interest, for any loss of earnings suffered because of the discrimination against him from December 2, 1981, through January 5, 1982, in accordance with the above section of this Decision entitled "The Remedy."

(c) Expunge from its files any reference to the discrimination against James L. Brewer, and notify him in writing that this has been done and that evidence of the unlawful discrimination will not be used as a basis for future actions against him.

(d) Make whole James L. Brewer and all other nonmember and traveller work applicants similarly situated for any loss of earnings they may have suffered by reason of the discrimination practiced against them because of lack of membership with Respondent, in the manner set forth in the section of this Decision entitled "The Remedy."

(e) Keep and retain for a period of two years from the date of this Decision perma-

nent written records of its hiring and referral operations which will be adequate to disclose fully the bases on which each referral if [sic] made, and, upon the request of the Regional Director for Region 15 or his agents, make available for inspection, at all reasonable times, any records relating in any way to the hiring and referral system.

(f) Submit four (4) quarterly reports to the Regional Director, due 10 days after the close of each calendar quarter, subsequent to the issuance of this Decision concerning the employment of the above-named employees and other nonmember and traveller applicants subsequently found to have been similarly situated. Such reports shall include the date and number of job applicants made to the Respondent, the date and actual number of actual job referrals by the Respondent and the length of such employment during such quarter period.

(g) Place the referral register, for a period of 2 years, on a table or ledge in the hiring hall for easy access and inspection by work applicants, as a matter of right, upon the completion of each day's entries in such registers.

(h) Preserve and, upon request, make available to the Board or its agents, for examination and/or copying, all records, reports, work lists, and other documents necessary to analyze the amount of back-pay due under the terms of this order.

(i) Post at its office in Baton Rouge, Louisiana, copies of the attached notice marked "Appendix B." [61]  Copies of said notice, to be furnished by the Regional Director for Region 15, shall, after being duly signed by an authorized representative of Respondent, be posted by it immediately upon receipt thereof, and be maintained by it for 60 consecutive days thereafter, in conspicuous places, including all places where notices to members and work applicants are customarily posted.  Reasonable steps shall be taken by the Respondent to ensure that said notices are not altered, defaced, or covered by any other material.

(j) Cause the attached notice marked "Appendix B" to be printed at its expense in a newspaper of general circulation in Baton Rouge, Louisiana.

(k) Notify the Regional Director for Region 15, in writing, within 20 days from the date of this Order, that [sic] steps the Respondent has taken to comply herewith.

IT IS ORDERED that the complaint be dismissed insofar as it alleges violations of the Act not specifically found herein.

Dated Washington, DC, June 9, 1983.

signed/ _____
Robert M. Schwartzbart
Administrative Law Judge

---

[61]  In the event that the Board's Order is enforced by a Judgment of a United States Court of Appeals, the words in the notice reading "POSTED BY ORDER OF THE NATIONAL LABOR RELATIONS BOARD" shall be changed to read "POSTED PURSUANT TO A JUDGMENT OF THE UNITED STATES COURT OF APPEALS ENFORCING AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD.["]